Representing Alexander Reed Mantle and Marjorie M. Mantle: Stephen R. Winship, Winship & Winship, PC, Casper, Wyoming. Argument by Mr. Winship.
Representing Gary W. Garland, Hot Iron, Inc., and GT Investments, Inc.: Kim D. Cannon & Codie D. Henderson, Davis & Cannon, LLP, Sheridan, Wyoming. Argument by Mr. Cannon.
Representing WyoDak Energy Services, LLC: Greg L. Goddard, Goddard and Vogel, P.C., Buffalo, Wyoming. Argument by Mr. Goddard.
Representing Raymond W. Garland, Matt R. Garland, Three Way, Inc., and MGM Enterprises, Inc.: Judith A. W. Studer, Schwartz, Bon, Walker & Studer, LLC, Casper, Wyoming. Argument by Ms. Studer.
Representing North Star Energy & Construction LLC: No Appearance.
Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.
FOX, Justice.
*768 [¶1] This case arose when the parties entered into an ill-conceived business conveyance plan during a downturn in the oil market. The three Garland brothers, Ray, Gary, and Matt,[1] each had separate entities which provided specialized services directly to, or related to, the oil industry in Northeast Wyoming and North Dakota. Upon the advice of their accountant, Karl Killmer, the Garlands formed a new entity in 2011, North Star Energy & Construction, LLC (North Star), with the Garlands' companies as members and the Garlands individually as managers. Alex Mantle, who had previously worked for Ray's company and was Mr. Killmer's friend, was named President of North Star. North Star made a profit at first but struggled with cash flow and took out substantial loans.
[¶2] In 2014, Mr. Killmer and Mr. Mantle proposed to buy North Star. In conjunction with obtaining the necessary financing, Mr. Killmer, Mr. Mantle, and the Garlands entered into a Memorandum of Understanding (MOU). Among other things, the MOU provided that Mr. Mantle and his wife, Marjorie Mantle, would personally guarantee payment of $6,110,000, part of the purchase price. As part of the buyout, North Star obtained a $3-million loan from First Northern Bank (FNB), secured by securities held by Mr. Mantle, Mrs. Mantle, and their trusts.
[¶3] Later in 2014, after the price of oil had dropped further, and after North Star had suffered significant losses as a result of some poor business practices, Mr. Mantle backed out of the deal. The Garlands took over management of North Star to complete pending jobs, auction equipment, and, by the spring of 2015, liquidate the company. While the wheels were falling off, the Mantles negotiated a new $3-million loan from FNB, and acquired the original North Star loan, stepping into FNB's shoes with regard to its loan to North Star. The scenario gave rise to an assortment of claims and counterclaims, some of which the district court disposed of on summary judgment, with the remainder resolved after a bench trial.
ISSUES
[¶4] The parties raise numerous procedural and substantive issues on appeal, which we rephrase:
1. Did the Garlands and their associated entities abandon their counterclaims when they did not refile them after the amended complaint?
2. Was the Memorandum of Understanding an enforceable contract?
3. Did the district court err when it concluded that the Garlands' negligent misrepresentation claim against Mr. Mantle would entitle them to no additional damages?
4. Did the district court err when it found no disputed issues of material fact to support Mantles' claim of actual fraud?
5. Did the district court correctly decide that certain North Star conveyances were fraudulent?
6. Are the Garlands entitled to equitable affirmative defenses?
7. Did the district court correctly conclude that the elements necessary for LLC veil-piercing were absent?
*769 8. Did North Star's members have a fiduciary duty to its creditors?
9. Did the Garlands owe the Mantles a duty of good faith?
10. Should the Garlands' breach of fiduciary duty claim have been brought as a derivative action?
11. Did the district court abuse its discretion when it denied Mantles' attorney fees?
FACTS[2]
[¶5] The Garland brothers, Gary, Ray, and Matt, were born and raised in Buffalo, Wyoming. In 1990, Gary formed Hot Iron, Inc., a company that specializes in "underground work, water and sewer, street rehabs." Ray Garland formed a separate entity, Three Way, Inc., which specialized in reclamation work for highways and pipelines. Matt Garland's company, MGM, Inc., specialized in trucking, heavy hauling, laying gravel, and building construction. Each of these businesses was operated independently until 2011, when North Star Energy & Construction, LLC was formed.
[¶6] Karl Killmer, a Casper CPA, started doing the accounting for Matt in 2004; for Gary and Hot Iron in 2006; and for Ray and Three Way in 2008. Beginning in 2000, Alex Mantle was employed by Three Way. Over time, Mr. Killmer and Mr. Mantle developed a close friendship. In the summer of 2010, the two began to discuss the formation of a company called North Star. When it became operational November 1, 2011, Mr. Mantle was appointed its President; he remained President until December 2014.
[¶7] North Star offered pipeline construction, roustabout, trucking, material hauling, road building, and underground utility services. Its members were Hot Iron, Three Way, and MGM. Ray and Gary were the initial managers, with Matt added as manager on December 31, 2011. Mr. Killmer was North Star's accountant. He calculated each member's capital contribution and determined each member's equity in North Star: 50% owned by Three Way, 30% by Hot Iron, and 20% by MGM. Mr. Killmer testified North Star had an initial capitalization of $11 million, and he did not consider this to be undercapitalized.
[¶8] North Star did not immediately generate money. However, North Star's operations in 2012 and 2013 were profitable, with a net income of $2,063,086 and $1,082,017, respectively. North Star had more than 300 employees during its three years of operations. Up until early 2014, Mr. Killmer prepared monthly financial statements based on the numbers Mr. Mantle supplied, which were provided to the members and reviewed at the company's regular monthly meetings.
[¶9] The North Star Operating Agreement expressly allowed members and managers to make loans to North Star if revenues were insufficient to pay the company's operating expenses. It also stated that loans would be "repayable by the Company to such Member ... at such date or dates as the Managers shall determine in his discretion[.]" Mr. Mantle and North Star's managers and members provided occasional short-term loans, and North Star obtained a line of credit from American National Bank (ANB). ANB dealt primarily with Mr. Mantle in its transactions with North Star. ANB and North Star entered into a Commercial Loan Agreement, signed by Mr. Mantle as North Star's managing member, on December 24, 2012. The loan agreement contained several covenants that would become significant: North Star would maintain a Debt/Worth Ratio not to exceed 1.25/1; any ownership changes must be pre-approved by ANB; and no additional debt could be incurred without prior approval by ANB. The 2013 amended agreement contained the same covenants and was also signed and initialed on each page by Alex Mantle.
[¶10] In January 2014, Mr. Mantle requested greater control of North Star, pronouncing, "the days of the 'round table' are over and we will move forward with the *770 'oblong table' that has a President at the head." He also wanted "to know that I don't have to seek approval for decisions before I make them." He promised to make $5,000,000 in profit on $77,000,000 of gross revenue in 2014. The Garland brothers agreed to Mr. Mantle's offer "to step back and let him run the company."
[¶11] North Star operations were "catastrophically unprofitable in 2014." The company began to feel the financial effects of the "Middle Loop" job, a large pipeline installation job for a CO2 recovery project that North Star had significantly underbid. In the last half of 2014, the price of oil declined more than 50%. Mr. Mantle testified that "North Star's future was based on the price of oil[.]" The Garlands received no North Star balance sheets or profit and loss statements after the first quarter of 2014 until late November 2014. Mr. Killmer testified that was "because I wasn't completing it."
[¶12] In May or June 2014, Mr. Mantle and Mr. Killmer proposed a buyout to the member entities of North Star. Mr. Mantle testified that he only became interested in acquiring North Star because he "believed in Karl Killmer's fairy tale, drank too much of his Kool-Aid." He explained that Mr. Killmer took the lead in proposing the plan, and in the buyout discussions with the Garland brothers. While those discussions continued, Mr. Mantle loaned North Star a total of $1.2 million in several payments between May 1, 2014, and September 2, 2014, even though his authority to incur indebtedness on behalf of North Star was limited to $100,000. In initial discussions, Mr. Mantle and Mr. Killmer proposed to pay $6.9 million for the members' equity and $7-million "blue sky,"[3] with the first secured and the second unsecured, and a $3-million down payment.
[¶13] Mr. Mantle and Mr. Killmer applied for a $3-million loan from First Northern Bank (FNB), which would be secured by securities held by Mr. Mantle and Mrs. Mantle. Gary believed that the FNB loan would be made to Mr. Mantle and Mr. Killmer. In an August 11, 2014, email to Mr. Mantle and the three Garlands, Mr. Killmer explained:
- [W]e have not issued the June financials pending the resolution of Middle Loop. Now that this has been settled, I will make adjustments and get June issued. June will show a significant loss.
- Currently waiting to hear from First Northern Bank (Ryan Fieldgrove). This loan is what we are planning on using to fund the down payment and to put $ $ $ $ back into the Company ("Baseball Card loan"). Per Ryan, they should have their Underwriting complete either today or tomorrow.
- Alex and I talked to Ann[ ] Nelson earlier today and will be talking to her later this afternoon. I will forward under separate e-mail the e-mail I sent to Ann[ ] on Friday. As you will note in that e-mail, we are trying to access $500,000 of the guaranteed auction $ $ $ $ as soon as possible. We will also be laying the groundwork on paying-off the Line of Credit ... the how and when[.]
[¶14] Initially, the entire $3 million was going to be paid to the North Star members as a down payment. Then, as North Star's finances deteriorated through the summer of 2014, Mr. Mantle and Mr. Killmer asked the members if they could put the $3 million into the company, offering to pay the members interest in the form of a salary,[4] with a payment of $1 million in June 2015, and monthly payments for ten years thereafter. On August 14, 2014, Mr. Mantle received North Star's June financials which showed a $4.69-million year-to-date loss. He did not recall giving the document to either FNB or the Garlands prior to the execution of the MOU and the FNB loan closing. Ryan Fieldgrove at FNB testified that he had not been provided with the June financials, although it would have been important information for the bank to have. The debt schedule which FNB had requested in order to assess the loan request omitted North Star debts to *771 American Express and Mr. Mantle. The final July financials, which were emailed to Mr. Mantle on September 4, 2014, reflected an even greater year-to-date loss of nearly $6 million. Between August 17, 2014, when Mr. Mantle received verbal approval of the FNB loan, and the loan closing on September 17th, Mr. Mantle made loans to North Star totaling $950,000, without consulting with any of the Garlands. The members were unaware that, by September 17th, Mr. Mantle had loaned North Star $1.2 million. When North Star received the FNB loan, Mr. Mantle repaid $1.2 million to himself, leaving $1.8 million for North Star.
[¶15] The Garlands understood that Mr. Mantle and Mr. Killmer were obtaining the $3-million loan, and that the main source of collateral was to be the Mantles' securities. Mr. Mantle testified that the collateral for the loan was North Star equipment and assets, and the securities held by him and his wife, with loan guarantees from him, his wife, and Mr. Killmer.
[¶16] On August 24, 2014, at what became known as the "white board meeting,"[5] Mr. Killmer and Mr. Mantle informed the Garlands that North Star had an operating loss of $4.6 million for the first six months, with $3.5 million attributable to the Middle Loop project. They forecasted a $1-million profit for the remainder of the year. Mr. Mantle and Mr. Killmer asked to split the losses with the Garlands and proposed a reduced purchase price. Mr. Killmer testified that he arrived at a $6,110,000 figure based on his valuation of the net equity and hard assets, using a valuation asset approach he had previously used. Mr. Mantle and Mr. Killmer were to personally guarantee the purchase amount of $6,110,000. In a September 2, 2014 email to his daughter, Ray explained:
As of the 1st of September Alex and Karl asked Gary, Matt and I to stand aside as the business sale was imminent by mid-September or early October. They felt they needed us out of the picture to gain more credibility. We agreed to their requests as a result and based on the following:
1. They could not pay a down payment at this time. They will pay a partial the first of July.
2. They will pay no payments until the first of July. They have to pay Matt, Gary and myself a wage until then.
3. They will no longer pay for our pickups etc.
4. We agreed to let them auction off another $3,200,000.00 worth of equipment that they have a guarantee price from the Auction Co. on. These funds were to be used to pay off the line of credit and equipment debt.
5. We agree to leave our personal CD investment that belongs to Gary, Alex and myself that amounts to $500,000.00 at the bank for a year. This helps with the covenants.
6. We had to participate in the year to date loss and take it off the total value that was based on 12/31/2013.
So what is the trade off and why would we agree to this[:]
1. The company value had decreased in value almost five million from the first of the year. Largely because of Salt Creek [Middle Loop]. ...
2. To bolster the company Alex would put in $3,000,000.00 cash.
3. Matt, Gary and I will be kept on the payroll until payments start coming in which will be the original figures used except they will probably be higher because we asked for the payment schedule to be cut by two years as trade off.
4. There will be a guaranteed floor of value that is to be maintained or else we take over and Alex loses his $3,000,000.00.
5. Karl has to personally guarantee and put up Killmer and [A]ssociates plus his other assets as collateral.
6. Alex has to personally guarantee the purchase. (I am suspect the Mantle-Marjorie *772 Investment account is larger than the $3 Mill.)
7. NS was to get rid of several overhead items such as: High dollar non-productive people. Excess pickups sent back to Enterprise. Move out of high dollar rental shop in Watford. (Gary has already sold this concurrently as we speak and will have a new shop, which is smaller and less expensive ready by 12/8/14. This will be much cheaper.)
8. The people who are gone so far are Andy Dennis Salt Creek, Tim Wheatly SC, all the rest of the SC crew, John Abseth maintenance super. Daniel Duncan. I will update as I learn more.
9. The bottom line of all these transactions are a more solid company with low debt to equity.
[¶17] The transaction ultimately took shape as a leveraged buyout, which Mr. Killmer defined as "using the company's assets and equity and earning st[r]eam to buy out the shareholders and its seller-financed debt. It's not paid for with equity or equity contributions." Mr. Mantle would be a 51% owner; Mr. Killmer 24%, and neither one would contribute any money of his own.
[¶18] After the white board meeting but before the $3-million loan was obtained, Robb Bischoff, North Star's Controller, sent Mr. Killmer and Mr. Mantle the "tweaked cash management spreadsheet." After taking into consideration a $3-million FNB loan, together with receipt of $3.3 million from anticipated equipment sales, North Star was still projected to lose $5 million beginning in October 2014. The next day, on August 28, 2014, Mr. Mantle wrote to his friend: "I can see a profitable future I'm just not sure there is enough gas in the tank to get us there. I may have just bought a really nice state room on the Titanic." The following day, Lori Zink, North Star's accounting manager, sent Mr. Mantle an email regarding "cranky utility vendor payments." These documents were not given to the Garlands or FNB prior to the loan closing.
[¶19] Mr. Mantle and Mr. Killmer took immediate steps to effectuate their "purchase" of North Star. On September 3, 2014, Mr. Mantle sent an email to the Garlands with the subject "Purchase Announcement," explaining that "I have begun to announce the news of our purchase of North Star." The next day, September 4th, Mr. Mantle informed the Garland brothers by email that their North Star credit cards "have been cancelled," and advised them to "transition[ ] your phone off the North Star plan." The Garlands moved out of their offices.
[¶20] In a North Star newsletter dated September 19, 2014, Alex Mantle announced:
NORTH STAR CHANGES OWNERSHIP!
On behalf of Karl Killmer, Josh Miller, Bryan Garland, Rafael Del Toro, Chris Knudson and myself we wish to announce as of September 1, 2014 we have purchased North Star from Ray, Gary, and Matt. We are very grateful for the opportunity and the trust the Garlands have placed in us. We are also very grateful for all of the outstanding employees dedicated to North Star. We look forward to a long and prosperous future.
Mr. Mantle gave himself the title of CEO.
[¶21] On September 4, 2014, Lori Zink sent Mr. Mantle the final figures for July showing losses of $718,933.35 for the month. The year-to-date losses were $5,902,900.29. The members' equity had eroded to $1,889,668.84. Mr. Mantle did not provide this financial information to FNB or the Garlands, although it was known to him before he signed the MOU and guarantee of the FNB loan. By September 2014, North Star was insolvent.
[¶22] North Star held three equipment auctions in 2014, the last and largest of which was September 23, 2014. Of the combined net proceeds of $4.53 million, only $1 million went to North Star for general operating purposes, and the remainder was used to pay secured creditors, primarily ANB.
[¶23] Despite North Star's dire financial condition, Mr. Mantle and Mr. Killmer proceeded with the buyout. As a condition to making the $3-million loan, FNB requested various documents and assurances, including: 1) a copy of the purchase agreement or a MOU setting forth the terms of the parties'
*773 agreement; 2) Mantles' securities, worth $3 million, to be placed in an FNB Trust account as collateral for the loan; 3) sale of some North Star equipment; 4) a second position lien on remaining North Star equipment; 5) debt subordination agreements by the Garlands; 6) a corporate resolution granting Mr. Mantle the authority to sign financial documents, including loans for the company; and 7) an explanation of the new ANB loan terms.[6]
[¶24] Accordingly, on September 17, 2014, the parties executed the following documents:
• The MOU
• North Star's promissory note in the amount of $3 million, signed by Alex Mantle as President of North Star
• A security agreement executed by Alex Mantle, the Marjorie M. Mantle Revocable Living Trust Agreement, Marjorie McWhorter Mantle, and the Alexander R. Mantle Revocable Living Trust Agreement
• Security agreement from North Star
• Personal guarantees of Alex Mantle, Marjorie Mantle, and Karl Killmer
• Subordination agreements by the Garlands
• FNB Loan Agreement
• Consent form to allow Alex Mantle to sign the loan paperwork as President on behalf of North Star
[¶25] After September 17th, all parties continued to conduct themselves as though Mr. Mantle and Mr. Killmer had acquired North Star. Mr. Mantle testified that, after September 17th, the Garlands had no North Star operational duties. Gary and Ray testified that they believed Mr. Mantle and Mr. Killmer owned North Star after the MOU was signed. Ray testified that he agreed that Mr. Mantle and Mr. Killmer could auction $3.2-million-worth of North Star equipment "[b]ecause they are the owners." In October, Mr. Mantle signed the PACCAR Equipment Lease Agreement as "Member" of North Star, and Mr. Killmer sent out the minutes for the October meeting (which was not attended by any of the Garlands), signing them "Your new Partner." On November 3, 2014, Marjorie Mantle sent Mr. Mantle an email saying:
I just want to reiterate how proud I am of you for taking the chance and making the move to become owner & CEO of Northstar. I know you have a vision for this company along with Karl and in order to reach this vision there are going to be times of financial anxiety. We are now experiencing the first wave of this anxiety and we will weather it in order to see the good decision in buying this company and making it a viable contender in the energy and reclamation field. I believe in your abilities to turn this company around and so do many other people. Everyone has signed on knowing the uphill climb because we all know there will be a turn around and success is in Northstar's future.
Winter is Coming
[¶26] Success was not in North Star's future and, in fact, the forces for its demise were already in place. In the fall of 2014, the price of oil was dropping, and North Star depended on oil field work. On October 26th, Ann Nelson at ANB had emailed Mr. Mantle requesting updates on:
• Monthly financials (The latest the bank has received is 6/30/2014. We are missing July statements on.)
• Monthly Borrowing Bases
• Covenant Compliance
• Updated equipment listing and new appraisal on all equipment following the 9/23/2014 auction
• Status of pending MOU and pending sale of NS. This will also trigger certain portions of existing ANB loan agreements.
Ms. Nelson testified that, when she sent this email, it was her understanding from her earlier conversations with Mr. Mantle that *774 the MOU was still being negotiated "to determine the particulars of a sale if it were to happen. And that was the document or something of that nature that ANB would need to review prior to."
[¶27] On November 21, 2014, ANB obtained North Star's financials. Ann Nelson forwarded them to her colleagues with the following email:
As I mentioned in our board meeting, both Alex Mantle and Karl Kil[l]mer are on vacation until 12/1. However, I was able (with a little convincing) to talk with their CFO, Robb Bischoff. He did some arm twisting of his own to obtain authorization to release the attached financials to the bank Friday afternoon.
Once you review them, you'll understand why North Star hasn't provided them earlier. The results are a disaster with a loss through 9/30 of $7.6mm. Robb also shared (off the record) that while October numbers aren't final yet, he anticipates that loss to widen to $8mm. He summed it up by saying that while NS has reduced revenues it has failed to correspondingly reduce its expenses, primarily direct payroll expenses.
I've responded to North Star that these numbers are significantly worse than what had been represented in our conversations over the past weeks and months. Previous representations from Alex and Karl were that July would have a $100-$300 loss, August would be breakeven up to a $100K loss, and September would have a $200k profit. Clearly that hasn't happened. I've asked for a meeting to discuss our next course of action. I'm waiting to hear back. While all NS loans are current, our only responsible course of action is a speedy, orderly exit from this relationship as soon as possible.
[¶28] The Garlands had also received the disastrous financial information, by email from Mr. Killmer on November 20, 2014, (conveying financial statements he and Alex Mantle had received November 7th). These were the first financial statements that the Garlands had received from Mr. Mantle or Mr. Killmer since March 2014. On November 22nd, the Garlands received a lengthy email from Mr. Killmer, which began: "As you are aware, we have continued to experience operating losses through September." He described various facets of the business and steps he and Mr. Mantle were taking to increase revenues and decrease costs and debt, and he assured the Garlands "that both Alex and I are still 'in' on buying the Company." He acknowledged, "We are currently 'in default' on paying Three-Way the balance of their income taxes for 2013," and he conceded it was unlikely they would be able to meet the payment schedule under the MOU. "Therefore, we ask you to consider a payment of $500,000 on July 1 and a payment of $500,000 on October 31 in lieu of the $1,000,000 payment on July 1st. To overstate the obvious, this will give us more 'healing time' to gather the $ $ $ $ $." Further, "[w]e ask that you consider releasing us from the personal guarantee." The Garlands did not release Mr. Mantle and Mr. Killmer from the personal guarantee obligation.
[¶29] Sometime in late November, Mr. Mantle made the decision that "this was not a good deal." In a November 29, 2014 email to a friend, Mr. Mantle said "North Star is not profitable and I'm struggling to figure things out and am running out of time. ... The falling price of oil also weighs heavily on my mind." This may explain why, when the renewal notice came for the errors and omissions policy which might have covered the Garlands' legal expenses in this litigation, Mr. Mantle did not renew it.
[¶30] On December 1, 2014, Mr. Mantle and Mr. Killmer received an email from ANB's general counsel notifying them that the $3-million FNB note on North Star's balance sheet "concerns us because the covenants in North Star's loans with ANB prohibit North Star from incurring any additional debt without ANB's consent, and ANB has not consented to any such indebtedness." The Garlands did not learn that ANB was calling North Star's loans until they received a letter from the bank on December 3rd. Meanwhile, at a December 2, 2014 meeting with the Garlands and Mr. Killmer, Mr. Mantle refused to sign the personal guarantees. He stated that if he owned the company without the requirement of personal guarantees, *775 his next move would be to liquidate. But then, in response to a December 4, 2014 email from Matt Garland, Mr. Mantle pushed back on demands Matt had made, saying "Do Karl and I work for you guys or did we buy the company? I thought all we did was postpone paperwork until June."
[¶31] Disaster followed disaster and, by letter dated December 15, 2014, ANB declared North Star's four outstanding loans in default, demanding payment in full on all loans by February 28, 2015. The same day, Mr. Mantle informed the Garlands that North Star could not make payroll or payroll taxes. Ray agreed to "put in $90,000 cash today to take care of tax deposit ... but I want it right back."
[¶32] On December 16th, the Garlands, Mr. Mantle, and Mr. Killmer met with ANB representatives in Cheyenne. The North Star principles indicated they could not pay off the four loans by February 28th. However, they proposed to sell North Star equipment at auction in March and April, to yield enough to pay off the first three notes, totaling $2.1 million; and to pay off the fourth note, secured by North Star's commercial property in Gillette (1401 Oil Drive), which had an outstanding balance of $568,000. Accordingly, on December 30, 2014, Mr. Mantle, signing as President of North Star, signed the document stating that North Star "agrees to sell the property at 1401 Oil Drive composed of shop, office, yard, welding shop to GT Investments for the sum of $650,000.00."[7] The property had been appraised in October 2013 at a value of $1,260,000, with a December 30, 2014 market condition analysis at the same value. (North Star purchased the property from MGM in 2013 for $750,000.) The same day, Mr. Mantle signed the Warranty Deed conveying the property to GT Investments.[8] None of the members of North Star had any interest in GTI at that time.
The Huge Hole
[¶33] Also in December 2014, the Garlands took over the management of North Star, demoting Mr. Mantle to Controller. Although the Garlands knew that North Star was insolvent, Ray still believed that, considering the company's equipment value, they could rebuild with hard work. Gary took over as North Star's President, and he determined to stop making payments on the FNB loan. He explained that he considered that loan to be an obligation of Mr. Mantle and Mr. Killmer as owners of North Star, and he chose instead to pay other North Star loans and debts, some of which were owed to or guaranteed by the Garlands or their entities. North Star's balance sheet showed a loss of $8,899,031.07 for 2014.
[¶34] In January 2015, the Garlands negotiated a modification to North Star's ANB loans that gave North Star additional time to pay them off. In exchange, ANB required that North Star's line of credit be secured by a cash deposit, which the Garlands complied with by obtaining a $500,000 loan from the Bank of Buffalo and purchasing a CD which they deposited at ANB. North Star made the monthly payments on the Bank of Buffalo loan, which totaled $37,792.52. When ANB's loans had been paid off, it released the funds back to the Garlands.
[¶35] Meanwhile, the Garlands continued their attempts to dig out of the "huge hole." In December 2014, Hot Iron made two loans to North Star totaling $45,000 so that it could make payroll. Those loans were repaid to Hot Iron on March 4, 2015. Hot Iron made another loan to North Star to cover payroll in January 2015, this time for $50,000, which was also repaid in March.
[¶36] In the fall of 2014, North Star had begun a project for the City of Sheridan. The job was shut down for the winter and was scheduled to resume in April 2015. However, North Star was unable to resume the work because it was required to sell its equipment to satisfy ANB's lien. Hot Iron, which had obtained the bond for the project, stepped in to complete the job. Hot Iron charged North *776 Star $325,000 for mobilization costs, which included purchasing equipment and materials, transporting equipment, paying supervisors, and obtaining financing. North Star paid Hot Iron for those mobilization costs in March and April 2015.
[¶37] By March 2015, North Star's financial condition had continued to deteriorate, and it was apparent that the company could not survive. Mr. Mantle resigned as Controller. In February and March 2015, North Star could no longer pay for its employees' health insurance. Gary testified that it was important to keep North Star employees to finish the jobs it had in the works, "instead of just picking up and walking off. And if we did that, [customers] would not have paid the money that we still had coming." So, Hot Iron put the North Star employees on its payroll to maintain their health insurance. North Star reimbursed the $59,952.82 associated with that cost to Hot Iron in May 2015. Finally, Hot Iron paid $25,000 to facilitate the sale of a crane, which enabled North Star to sell the crane and reduce its debt by approximately $385,000. North Star reimbursed Hot Iron the $25,000 in July 2015.
[¶38] North Star's Operating Agreement provided for its members and affiliates to make loans to the company, and from its inception, Ray, Gary, and Mr. Mantle did so. After they took back management of North Star, repayments of the loans to the Garlands accelerated. Gary was repaid $370,166.91 in 2015. Ray was repaid $190,000. Mr. Mantle testified he noticed a pattern of paying vendor debt guaranteed by the Garlands. North Star's accounting manager, Lori Zink, testified that, in early 2015, the Garlands requested a list of creditors they had personally guaranteed. She said it seemed that those creditors were getting paid after the list was produced. Gary agreed that some debts that had been personally guaranteed by him and his brothers were paid off after he took over as President of North Star. In contrast, in March 2015, North Star stopped paying the PACCAR truck leases, which had been guaranteed by Mr. Mantle and Mr. Killmer, and one of the employee credit cards, guaranteed by Mr. Mantle. On August 5, 2015, North Star's members executed its Plan of Liquidation.
WyoDak
[¶39] In the fall and winter of 2014, it had become clear to some employees of North Star that the company would fail. In March 2015, North Star employees Chris Knudson and Josh Miller, along with numerous other North Star employees, began searching for new employment. Around that same time, Mr. Knudson, Mr. Miller, and Gary Garland began discussing the possibility of forming a new company, WyoDak, whose purpose would be to employ North Star employees who were going to be out of work and to provide oil and gas roustabout services on a small scale. WyoDak was formed on April 3, 2015. Mr. Knudson, Mr. Miller, and Gary were the company's members, and each contributed $75,000. Mr. Knudson and Mr. Miller served as WyoDak's managers; Gary did not participate in managing the company. In May of 2015, WyoDak began hiring employees, almost all of whom had been North Star employees. In a series of transactions, WyoDak acquired various pieces of equipment that had previously been owned or leased by North Star. One such purchase was for 16 pickup trucks that North Star had leased from Enterprise. Enterprise had intended to repossess these and other trucks it leased to North Star before North Star could liquidate them in an equipment auction because North Star was not current on its lease payments. Before Enterprise repossessed them from North Star, Mr. Knudson contacted Enterprise and agreed to pay the remaining North Star lease balances to purchase the 16 vehicles. As a result of this agreement, Enterprise allowed North Star to include the remaining truck fleet in the equipment auction. After the auction, WyoDak paid North Star an additional $125,000 for the 16 pickup trucks.
Mantles step into FNB shoes
[¶40] By letter dated February 2, 2015, FNB sent notice of default on its loan to North Star, the Mantles, the Alexander R. Mantle Revocable Living Trust, the Marjorie M. Mantle Revocable Living Trust, and Mr. *777 Killmer. FNB relied on the securities that the Mantles and their Trusts had placed as collateral before looking to North Star's assets. However, FNB learned that it "may have incorrectly taken the securities as collateral by not properly seeking permission from the beneficiaries." In June 2015, FNB sold its $3-million North Star promissory note to the Mantles. That sale was financed by a new loan to the Mantles from FNB, this one properly secured by the same securities. As a result of this transaction, FNB's security situation was improved, and the Mantles stepped into FNB's shoes on its first loan to North Star, a position which poised them as the plaintiffs in this litigation.[9]
[¶41] After the June 2015 auction of North Star equipment, the ANB loans were fully paid off. Those loans had been personally guaranteed by Gary or one of his entities. FNB, which had retained a second lien position on the North Star equipment, received $670,483 from the proceeds of the auction, which went to pay down the Alex and Marjorie Mantle "replacement note." (The money did not go to the Garlands because they had signed subordination agreements in conjunction with the FNB loan.) After the auction, North Star still had approximately $2 million in debt to unsecured creditors.
Course of Proceedings
[¶42] On May 22, 2015, the Mantles filed their Complaint against North Star, Gary, Ray, Matt, Three Way, Hot Iron, MGM, GTI, and WyoDak. They asserted a subrogation claim based on their assumption of the FNB note, and alleged unjust enrichment, constructive fraud, bad faith, negligent misrepresentation, fraudulent conveyance, and alter-ego liability. The Garlands and their related entities counterclaimed, alleging breach of contract (the MOU), breach of fiduciary duty, promissory estoppel, and equitable estoppel. North Star also answered and counterclaimed, and remained a party throughout the proceedings in district court. Hot Iron, Three Way, MGM, and North Star later filed a combined amended counterclaim and third-party complaint against Alex Mantle, Karl Killmer, and Karl Killmer & Associates, P.C. They alleged breach of contract and breach of implied contract to enforce the Mantle and Killmer guarantees; promissory estoppel; negligent misrepresentation; breach of fiduciary duty, equitable estoppel, and unclean hands against Alex Mantle; and accountant malpractice against Karl Killmer and Killmer & Associates.
[¶43] On June 8, 2016, Alex Mantle and Marjorie Mantle filed their amended complaint, which added claims of breach of fiduciary duty, securities violation, and actual fraud. The defendants filed answers to the amended complaint, but did not refile their counterclaims. WyoDak answered the complaint and the amended complaint.
[¶44] After the clerk of court entered default against Karl Killmer and Killmer & Associates, and the defendants/third party plaintiffs moved to dismiss and approve settlement, the district court entered its order dismissing the claims against Mr. Killmer and his firm with prejudice on December 5, 2016.
Summary Judgment
[¶45] The district court entered its order on the parties' cross-motions for summary judgment May 3, 2017. The court granted partial summary judgment to the Mantles on their subrogation claim, finding they were entitled to judgment against North Star on the balance of the FNB note they had assumed, but there remained a question of fact on the amount of damages. The court granted summary judgment to WyoDak on the claims against it for fraudulent transfer and alter-ego liability, and dismissed it from the action. The court granted summary judgment to the remaining defendants (except North Star) on the Mantles' claims for unjust enrichment, bad faith, breach of fiduciary duty, nondisclosure as fraud, actual fraud, and securities violations. The court denied the Mantles' motion for judgment on the pleadings on all of defendants' counterclaims, rejecting the argument that they had abandoned those *778 claims when they failed to refile them after the amended complaint. Finally, the court denied plaintiffs' motion for summary judgment on the MOU, finding there were material questions of fact about whether it was an enforceable contract.
[¶46] On May 19, 2017, the Mantles filed their motion to file a second amended complaint, which the district court denied in its Order After Pretrial Conference, finding that it was "untimely, and it appears to be an improper attempt to have the Court reconsider its ruling on the summary judgment motions."
Bench Trial
[¶47] After a bench trial, the district court entered its W.R.C.P. 52 findings of fact and conclusions of law. The court entered judgment against North Star on the FNB note assumed by the Mantles in the amount of $2,712,838.22. It rejected the Garland entities' argument that this amount should be offset by either the $1.2 million that Alex Mantle paid himself from the FNB loan proceeds, or the amount that the Mantles paid FNB on the replacement note. The order allowed the Mantles to recover attorney fees on that count, so long as they sufficiently itemized the fees to specify the count to which they pertained. The district court also found that some of the challenged conveyances from North Star to the Garlands or their related entities were technically fraudulent conveyances under the Uniform Fraudulent Transfer Act, Wyo. Stat. Ann. §§ 34-14-205 and 206. It awarded the Mantles a $250,000 judgment against Gary and a $307,000 judgment against Ray as to those claims. The district court also concluded that North Star was not the alter ego of its member entities and refused to pierce the LLC veil.
[¶48] With respect to the counterclaims, the district court concluded that the MOU was an enforceable contract and entered judgment in favor of the Garland entities in the amount of $6,110,000, the amount of Mr. Mantle's personal guarantee. The court held that any damages arising from the claims against Mr. Mantle for negligent misrepresentation and breach of fiduciary duty would not differ from their breach of contract damages, and they were not entitled to additional damages on those counts. Finally, the district court held that the Garland's equitable estoppel and unclean hands claims were really affirmative defenses, and since the Mantles only prevailed on their claim on the note against North Star, it was unnecessary to address them. In a footnote, the court said that it would not offset the Garland judgments awarded to both Marjorie and Alex Mantle against the breach of contract judgment awarded only against Alex Mantle.
[¶49] The Mantles filed a W.R.C.P. 59 motion seeking further findings on the application of the Killmer settlement funds. The Garland entities filed a W.R.C.P. 59 motion to alter or amend the judgment to permit an offset of the amounts awarded to the Mantles. The district court denied both motions, and it denied the Mantles' request for attorney fees, finding that they had failed to sufficiently itemize their fees to allow the court to determine the fees to allocate to a particular claim.
[¶50] The Mantles timely appealed in case S-18-101; Raymond Garland and Three Way, Inc. appealed in S-18-102; and Gary Garland appealed in S-18-103. We consolidated the cases for oral argument and decision. North Star did not file an Appellee brief.
DISCUSSION
I. The Garlands and their associated entities did not abandon their counterclaims
[¶51] The district court denied Mantles' motion for judgment on the pleadings on defendants' counterclaims, rejecting the argument they had been abandoned when they failed to replead them after Mantles' amended complaint. The standard of review on dismissal under W.R.C.P. 12(c) is de novo. Elworthy v. First Tennessee Bank , 2017 WY 33, ¶ 20, 391 P.3d 1113, 1119 (Wyo. 2017).
[¶52] Generally, parties must plead in response to an amended complaint. W.R.C.P. 15(a) (LexisNexis 2016) ("A party shall plead in response to an amended pleading within *779 the time remaining for response to the original pleading or within 10 days after service of the amended pleading, whichever period may be the longer, unless the court otherwise orders.").[10] Garlands and their associated entities filed answers and counterclaims to the original complaint, and then filed combined amended counterclaims, and a third-party complaint, in a standalone pleading. Mantles answered the counterclaims and third-party complaint. Approximately three months later, Mantles filed an amended complaint. Garlands filed their answers to the amended complaint, but they did not reassert their counterclaims. Mantles therefore contend the counterclaims were abandoned.
[¶53] Courts that have found counterclaims were abandoned when they were not replead after an amended complaint did so, in part, because of the stage of the proceedings. In Johnson v. Berry , 228 F.Supp.2d 1071, 1079 (E.D. Mo. 2002), the court declined to grant the defendant leave to replead, because the trial was "imminent and all claims of the first amended complaint [had been] subject to summary judgment[.]" Id. ; see also Bremer Bank, Nat. Ass'n v. John Hancock Life Ins. Co. , No. CIV. 06-1534 ADM/JSM, 2009 WL 702009, at *12 (D. Minn. Mar. 13, 2009) (unreported) (citing Johnson with approval and noting defendant's "failure to replead the counterclaim, together with nearly two years passing without discovery or any action on the counterclaim"); General Mills, Inc. v. Kraft Foods Global, Inc. , 487 F.3d 1368, 1376-77 (Fed. Cir. 2007) (citing Johnson and holding district court did not abuse its discretion in finding defendant had abandoned counterclaim when it failed to file an answer to amended complaint).
[¶54] In contrast, several courts have held that failure to replead counterclaims in response to an amended complaint does not abandon them. Mullins v. Medical Lien Mgmt., Inc. , 411 P.3d 798, 803-04 (Colo. App. Div. I 2013) ; Ground Zero Museum Workshop v. Wilson , 813 F.Supp.2d 678, 705-06 (D. Md. 2011) ; Cairo Marine Serv., Inc. v. Homeland Ins. Co. of New York , No. 4:09CV1492 CDP, 2010 WL 4614693, at *1 (E.D. Mo. Nov. 4, 2010) (unpublished order); Dunkin' Donuts, Inc. v. Romanias , No. Civ.A.00-1886, 2002 WL 32955492, at *2 (W.D. Pa. May 29, 2002). We find this second line of cases more persuasive in these circumstances. First, Fed. R. Civ. P. 13, "which govern[s] the counterclaims, does not mandate that counterclaims be brought exclusively in an answer." Mullins , 411 P.3d at 803 (citing Ground Zero , 813 F.Supp.2d at 706 ). Rather, the rule "requires only that a counterclaim be set forth in a pleading." Ground Zero , 813 F.Supp.2d at 706 (quoting Dunkin' Donuts , 2002 WL 32955492, at *2 ). Interpretation of the federal rule is persuasive in our interpretation of the similar W.R.C.P. 13. See Wyo. Guardianship Corp. v. Wyo. State Hosp. , 2018 WY 114, ¶ 16 n.6, 428 P.3d 424, 432 n.6 (Wyo. 2018) ; Baker v. Speaks , 2013 WY 24, ¶ 33, 295 P.3d 847, 855 (Wyo. 2013).
[¶55] Second, the record does not show any intent to abandon or failure to prosecute the counterclaims. The Garlands and their related entities actively pursued their claims throughout discovery, summary judgment, trial, and this appeal. In contrast to Johnson and similar cases, Mantles do not assert failure to replead the counterclaims prejudiced them; rightly so, as the record would not support that contention. Here, the defendants timely answered the amended complaint and continued to actively pursue the claims asserted in their counterclaims. Defendants answered Mantles' amended complaint on June 21, 2016; Mantles did not move to dismiss the counterclaims for failure to replead them until February 6, 2017. We affirm the district court's conclusion that the counterclaims were not abandoned.
II. The Memorandum of Understanding is an enforceable contract
A. Standard of Review
[¶56] Mantles argue the standard of review is unclear because the district court denied their summary judgment motion on the enforceability *780 of the MOU, and we have not "determined the applicable standard of review for a lower court's denial of a summary judgment motion when the lower court's decision on the dispositive motion did not fully resolve the case." Mantles point out that, in denying their motion for summary judgment, the district court held that the defendants "met their burden of showing that there are material questions of fact about whether the MOU is an enforceable contract," but then, in its Order After Bench Trial, the district court stated: "the plain language of the MOU shows that a contract was formed" and that "the written contract is clear and unambiguous." Presumably, they are arguing we should review enforceability of the MOU as we would a summary judgment motion that completely disposes of the case (de novo), because the district court made a conclusion of law in its Order After Bench Trial it could have made at the summary judgment stage, namely, that the contract was unambiguous.[11]
[¶57] The denial of summary judgment is generally not a final appealable order. Irene v. Seneca Ins. Co ., 2014 WY 145, ¶ 23, 337 P.3d 483, 492 (Wyo. 2014) (citing Campbell Cty. Mem. Hosp. v. Pfeifle , 2014 WY 3, ¶ 12, 317 P.3d 573, 576 (Wyo. 2014) ). Further, the district court did not conclude the contract was ambiguous when it denied summary judgment. Determining whether a contract is ambiguous is a matter of law for the court to decide. Ultra Res., Inc. v. Hartman , 2010 WY 36, ¶ 23, 226 P.3d 889, 905 (Wyo. 2010). The district court denied the motion for summary judgment because the defendants "met their burden of showing that there [were] material questions of fact about whether the MOU is an enforceable contract[.]" The question of whether a contract has been formed is a question of fact. Hunter v. Reece , 2011 WY 97, ¶ 13, 253 P.3d 497, 500 (Wyo. 2011) ; see Section C. infra. Indeed, we have said that "where the existence of a contract or the terms of it is the point in issue, as here, and the evidence is conflicting or admits of more than one inference, ... the question should be put to the trier of the facts as a matter for their determination, and it is not the province of the court to determine[.]" Roussalis v. Wyoming Med. Ctr., Inc. , 4 P.3d 209, 232 (Wyo. 2000). The Mantles' argument conflates whether a contract has been formed with whether a contract is ambiguous. Because the court found material issues of fact on a factual question, allowing the matter to proceed to a bench trial was appropriate, and we apply our usual standard of review following a bench trial.
The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. In considering a trial court's factual findings, we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law. The district court's conclusions of law are reviewed de novo .
Galiher v. Johnson , 2018 WY 145, ¶ 6, 432 P.3d 502, 507 (Wyo. 2018) (quoting Graybill v. Lampman , 2014 WY 100, ¶ 25, 332 P.3d 511, 519 (Wyo. 2014) ).
B. We examine the entire MOU to determine that it is an enforceable contract
[¶58] Mantles urge this Court to analyze the enforceability of the personal guaranty *781 independent of the remainder of the MOU. They argue the personal guaranty provision is not an enforceable agreement because its terms are not sufficiently definite to permit enforcement or reflect a meeting of the minds. However, their reliance on Edwards Family P'ship L.P. v. Dickson , 821 F.3d 614, 617 (5th Cir. 2016) to support the contention that the MOU and the personal guaranty should be analyzed separately is misplaced. There, the court described a guaranty as a "collateral undertaking." Id . The appellant in Edwards Family Partnership had "executed contemporaneous, independent, respective guaranties" under which he "unconditionally and absolutely guarantee[d] ... the due and punctual payment and performance" of separate loan agreements to a business of which he was President. Id. at 615. The decision does not speak to the interpretation or enforceability of a guaranty clause within a contract containing the underlying obligation. Rather, the court's statement that guaranties are collateral agreements related to its assessment of whether the appellant could be liable as a personal guarantor when the business's obligations under the loan agreements had been discharged. Id. at 617.
[¶59] Mantles also interpret our statement in Transamerica Commercial Fin. Corp. v. Naef , 842 P.2d 539, 542 (Wyo. 1992) that "[t]he law of guaranty is part of general contract law" to mean that we "[apply] Wyoming contract rules to just the guaranty." However, immediately following that statement we said "[w]hen the guarantor is not a part of the original transaction of the principal obligor, his promise must be supported by separate consideration." Id. We then said that "[t]he rule [that a guaranty must be supported by separate consideration] only applies where the guarantor was not a part of the original transaction of the obligor. Otherwise, the original transaction itself supplies the necessary consideration." Id. In contrast to the circumstances in Transamerica , here, Mr. Mantle was part of the original transaction of the principal obligor. Thus, the personal guaranty within the MOU need not independently satisfy the elements necessary to form a contract, so long as the MOU does. This is consistent with our well-established approach to contract interpretation:
[W]e interpret a contract as a whole, reading each provision in light of all the others to find their plain meaning. We presume each provision in a contract has a purpose, and we avoid interpreting a contract so as to find inconsistent provisions or so as to render any provision meaningless.
Claman v. Popp , 2012 WY 92, ¶ 28, 279 P.3d 1003, 1013 (Wyo. 2012) (internal citations omitted). See also P & N Inv., LLC v. Frontier Mall Assoc., LP , 2017 WY 62, ¶ 13, 395 P.3d 1101, 1105 (Wyo. 2017) (quoting Pope v. Rosenberg , 2015 WY 142, ¶ 20, 361 P.3d 824, 830 (Wyo. 2015) ); Gumpel v. Copperleaf , 2017 WY 46, ¶ 29, 393 P.3d 1279, 1290 (Wyo. 2017) (quoting Thornock v. PacifiCorp , 2016 WY 93, ¶ 13, 379 P.3d 175, 180 (Wyo. 2016) ). We will therefore look to the entire MOU and not the guarantee in isolation to determine if the parties entered into a contract.
C. The terms of the MOU are sufficiently definite
[¶60] Mantles argue the MOU is not a final, binding agreement for sale of the Garlands' ownership interests in North Star, describing it as an "interim document" drafted solely to satisfy an FNB loan requirement. They suggest these facts indicate the MOU is not a final agreement: (1) no transfer of the Garlands' ownership interest occurred; (2) the Garlands continued to receive manager salaries after its execution; (3) North Star's attorney drafted additional documents related to the sale after its execution; (4) the Garlands "[took] back full control of [North Star] in early December, 2014"; (5) Gary Garland testified that the MOU was not the final agreement for the buyout; and (6) the Garlands never read the MOU. He also identifies terms not included in the MOU or that changed after its execution, arguing these terms reflect a lack of mutual assent: (1) omission of date when payment of the first note would begin; (2) changed payment provisions; (3) changes to North Star's obligation to obtain releases of the Garlands' personal guarantees of North Star debt; (4) "glancing references" to a non-compete agreement; (5) omission of terms of security agreements *782 securing the Garlands' interests in the first note; (6) omission of terms of the first note; (7) omission of "tax planning issues"; (8) the indefiniteness as to the amount to be paid to ANB from the equipment auction; (9) lack of dispute resolution or enforcement provisions; and (10) lack of provision defining events of default. Mantles also argue the provision requiring each party to execute all documents "as the other shall reasonably request in order to carry out the purposes of the [MOU]" indicates the MOU was not a contract. Finally, they claim the financial condition of North Star rendered the Garlands' request to sign the documents necessary to close the transaction unreasonable.
[¶61] The Garlands argue the MOU is enforceable under well-established rules of contract interpretation. They claim the MOU sufficiently "identifies the parties, the obligations assumed, and the promises being made." They point out the MOU contains a merger clause, which states that the MOU "contains the entire agreement between the parties[.]" They assert that, even if the MOU is missing some terms, it contains all the terms essential to form a contract. They argue that both the plain language of the MOU and the circumstances surrounding its execution support this conclusion.
[¶62] "Whether a contract has been entered into depends on the intent of the parties and is a question of fact." Hunter , 2011 WY 97, ¶ 13, 253 P.3d at 500 (quoting Wyoming Sawmills, Inc. v. Morris , 756 P.2d 774, 775 (Wyo. 1988) ). Likewise, "[t]he question of what is an essential term is often a question of fact ... and thus must frequently be decided by a jury." Roussalis , 4 P.3d at 232 (citing Pantzer v. Shields Development Co. , 660 F.Supp. 56, 60 (D. Del. 1986) ). "In determining the intent of the parties in contract situations, whether in the context of formation as we have here or in the context of interpretation, we use an objective approach." Roussalis , 4 P.3d at 231. Thus, "[a] party's intention [is] held to be what a reasonable man in the position of the other party would conclude his manifestations to mean." Id. (citing Shrum v. Zeltwanger , 559 P.2d 1384, 1387 (Wyo. 1977) ). Concerning whether the terms of an alleged contract are sufficiently definite to support a finding of formation, we have said:
While it is essential that the mutual assent of the parties to the terms of a contract must be sufficiently definite to enable the court to ascertain what they are, nevertheless it is not necessary that each term be spelled out in minute detail. It is only that the essentials of the contract must have been agreed upon and be ascertainable. The law does not favor the destruction of contracts on the ground of indefiniteness, and if it be feasible the court will so construe the agreement so as to carry into effect the reasonable intention of the parties if that can be ascertained.
Roussalis , 4 P.3d at 231-32 (citing Engle v. First Nat'l Bank of Chugwater , 590 P.2d 826, 831 (Wyo. 1979) ). In part, this is because the argument that an agreement is too indefinite to be a contract is frequently "an afterthought excuse for attacking an agreement that failed for reasons other than the indefiniteness." Roussalis , 4 P.3d at 238 (citing 1 Joseph M. Perillo, Corbin on Contracts § 4.1, at 535-37 (rev. ed. 1993) ).
[¶63] We "first interpret the language of the contract, and ... next consider the parties' preliminary negotiations and references to external sources of terms, including trade and other standard terms." Roussalis , 4 P.3d at 238 (citing I E. Allan Farnsworth, Farnsworth on Contracts § 3.28, at 356 (1990) ). "An agreement may be fleshed out by usages to which the parties are subject, by a course of dealing between the parties prior to their agreement, or by a course of performance between them after their agreement." I Farnsworth, § 3.28, at 357. Indeed, evidence that one of the parties "has begun performance is nearly always evidence that [the parties] regard the contract as consummated and intend to be bound thereby." 1 Perillo, § 4.1, at 542. So, for example, "[a] party's subsequent behavior, such as issuing a press release, may be persuasive [in determining whether a contract was formed], especially if inconsistent with the party's later contention." Roussalis , 4 P.3d at 232 (citing I Farnsworth, § 3.8, at 184).
*783 [¶64] We consider whether the MOU uses words of present contract formation and its degree of formality. In Roussalis , one of the parties challenged whether a contract had been formed based on allegedly indefinite terms in the parties' Letter of Intent. Id. at 233. There, we were "struck by the words of present contract formation" in the Letter of Intent, including the words: "the following offer," by "signing this letter of intent, you are agreeing to a legally enforceable contract ...," "[t]his agreement is binding," and "[WMC] intends to be legally bound by the terms and conditions set forth in this letter." Id. See also I Farnsworth, § 3.8 n.3, at 179-80 ("[I]n many cases courts have looked to the degree of formality and the use of legal terminology.").
[¶65] The MOU uses formal legal language of present intent:
• "Now, [t]herefore, in consideration of the mutual covenants and agreements herein contained, ... the Parties do hereby memorialize their understanding as follows:"
• "The Company agrees to redeem [stock] ... in exchange for the following: ..."
• "In addition to redeeming their membership interest in the Company each of the Member Corps and Ray, Gary and Matt, individually agree not to compete ... with the Company for a period of three years."
• "B Units agree[ ] to terminate ... in exchange for ...."
• "In exchange for providing security and/or a guarantee ... the Company agrees to issue [stock] ...."
• "The Company agrees to repay and use its best efforts to modify its outstanding obligations to ANB Bank ...."
• "The Company agrees to borrow ...."
• "This Memorandum contains the entire agreement between the Parties ...."
• "Each Party represents and warrants that it has all requisite power and authority to execute and deliver this Memorandum and perform its obligations hereunder."
• "In Witness Whereof, the Parties have caused this Memorandum to be duly executed and delivered as of the date first above written [signatures]."
[¶66] The circumstances surrounding creation of the MOU and the parties' conduct before and after making the MOU also shed light on their intent. Shortly after the white board meeting, Mr. Mantle sent an email entitled "Purchase Announcement" to the Garlands, explaining that he was beginning to announce his purchase of North Star. He also sent the Garlands an "Ownership Transition Changes" email, informing them that their North Star credit cards had been cancelled and directing them to remove their phones from the North Star plan. The Garlands also moved out of their offices. In a North Star newsletter dated September 19, 2014, Mr. Mantle announced North Star's change of ownership. Mr. Mantle also gave himself the title of CEO. This conduct is additional evidence that the parties believed they were bound by the terms of the MOU. In addition, in November 2014, Mr. Killmer asked the Garlands to adjust the payment schedule and to release him and Mr. Mantle from their personal guarantees. This is further proof they believed themselves to be bound by the terms of the MOU. Payment to the Garlands of manager salaries was intended by all parties to be a form of interest payment on the North Star purchase price, and the fact that the transfer never occurred is likely attributable to Mr. Mantle's refusal to perform his part of the contract. He did not refuse because the contract terms were indefinite, but, rather because he determined it "was not a good deal."
[¶67] The district court's finding of fact that the parties formed a contract was not clearly erroneous.
D. The MOU is supported by consideration
[¶68] Mantles argue the MOU is not supported by consideration because Mr. Mantle "did not ever receive any ownership in [North Star]." The Garlands argue consideration in the form of mutual promises and subordination agreements supports the MOU.
*784 [¶69] "The basic elements of a contract are offer, acceptance and consideration." McLean v. Hyland Enter., Inc. , 2001 WY 111, ¶ 42, 34 P.3d 1262, 1272 (Wyo. 2001) (citing Bouwens v. Centrilift , 974 P.2d 941, 946 (Wyo. 1999) ). "A generally accepted definition of consideration is that a legal detriment has been bargained for and exchanged for a promise." Moorcroft State Bank v. Morel , 701 P.2d 1159, 1161-62 (Wyo. 1985). A sufficient legal detriment is the promise or performance of "any act, regardless of how slight or inconvenient, which [the promisee] is not obligated to promise or perform so long as it does so at the request of the promisor and in exchange for the promise." 3 Williston on Contracts § 7:4 (4th ed.), Westlaw (database updated November 2018). "By the same token, the term 'benefit' means the receiving as the exchange for a promise some performance or forbearance which the promisor was not previously entitled to receive." Id. Thus, "[v]aluable consideration ... may consist of an exchange of mutual promises, which promises impose a legal liability upon each promisor." Kindred Healthcare Operating, Inc. v. Boyd , 2017 WY 122, ¶ 42, 403 P.3d 1014, 1024-25 (Wyo. 2017) (quoting Carroll v. Bergen , 2002 WY 166, ¶ 12, 57 P.3d 1209, 1214 (Wyo. 2002) ). "[W]e have long held that absent fraud or unconscionability, we will not look into the adequacy of consideration." Brodie v. Gen. Chem. Corp. , 934 P.2d 1263, 1268 (Wyo. 1997).
[¶70] The MOU is supported by consideration. The parties exchanged mutual promises that imposed legal liability on each of them. For example, the MOU states that "[i]n exchange for providing security and/or a guarantee of the First Northern Loan ... and the $6.1 Note ... to the Member Corps, Alex will be issued 38,465 Common Units of [North Star]." The Garlands further agreed to subordinate their interests in North Star's assets, which resulted in part of the proceeds from the equipment auction going to pay off the FNB loan now held by the Mantles. The parties promised to exchange "security and/or a guarantee" for stock in North Star. Additionally, the Garlands agreed not to compete with North Star for three years in exchange for the payment. There was consideration for the MOU.
E. There was not a mutual mistake of fact such that the MOU can be reformed or cancelled
[¶71] Mantles argue Mr. Mantle and the Garlands "either overlooked ... or ... assumed the other party was addressing the ANB loan covenant prohibitions" resulting in a "mutual mistake of fact ... that nullified the MOU." The Garlands respond that any mistake was Mr. Mantle's alone.
[¶72] A court may reform or cancel a contract that does not reflect the parties' true intentions due to a mutual mistake of fact. Larson v. Burton Constr., Inc , 2018 WY 74, ¶ 11, 421 P.3d 538, 543 (Wyo. 2018). "A mutual mistake is one which is reciprocal and common to both parties with each party being under the same misconception as to the terms of the written instrument." Hansen v. Little Bear Inn Co. , 9 P.3d 960, 964 (Wyo. 2000) (quoting Patel v. Harless , 926 P.2d 963, 966 (Wyo. 1996) ). A party seeking reformation based on a mutual mistake of fact must prove three elements by clear and convincing evidence: (1) there was a prior agreement that the written instrument undertook to evidence; (2) a mistake occurred in drafting the instrument; and (3) there was no fraud or inequitable conduct on the part of a party. Larson , 2018 WY 74, ¶ 11, 421 P.3d at 543 (citing Gumpel , 2017 WY 46, ¶ 75, 393 P.3d at 1299 ); Hansen , 9 P.3d at 964. "Clear and convincing evidence is 'proof which would persuade a trier of fact that the truth of the contention is highly probable.' " Gumpel , 2017 WY 46, ¶ 75, 393 P.3d at 1299 (quoting Sanders v. Sanders , 2010 WY 77, ¶ 12, 234 P.3d 343, 348 (Wyo. 2010) ).
[¶73] Mantles allege a mutual mistake occurred because the MOU did not address how the buyout would affect relations with ANB and the parties' "misassumptions"[12] as to ANB's position on the buyout. They assert the MOU's goal of releasing ANB's security *785 interests once ANB was repaid and its reference to "Modification of ANB Bank Loans" immediately followed by a description of the FNB loan obligation led to "[t]he reasonable inference ... that the ANB loan covenant prohibiting additional indebtedness was overlooked." However, their burden is not to show a "reasonable inference" of a mutual mistake; rather, it is to show a mutual mistake by clear and convincing evidence. Further, Mantles have not presented any evidence that Alex and the Garlands had come to a prior agreement concerning the buyout's effect on the ANB loan covenants. Indeed, they state that "the issue of any violation of any ANB loan covenants never arose in any discussion about the proposed buyout much less in the MOU." Thus, the written instrument does not inaccurately reflect a prior understanding between the parties.
F. The ANB loan covenants are not a supervening event such that the agreement was commercially frustrated
[¶74] Mantles also argue "the buyout ... was made impossible by application of the doctrine of commercial frustration considering the fundamental condition precedent [that the buyout would not affect relations with ANB]." The Garland entities counter that, although the violation of ANB loan covenants "made the situation less enticing to Alex Mantle as the new owner [of North Star]," it did not affect the fundamental purpose of the contract and, thus, did not excuse Mr. Mantle's performance.
[¶75] Commercial frustration concerns "the effect of supervening circumstances upon the rights and duties of the parties [where] '[p]erformance remains possible but the expected value of performance to the party seeking to be excused has been destroyed by a fortuitous event[.]' " Wallace v. Pinnacle Bank-Wyoming , 2012 WY 64, ¶ 19, 275 P.3d 1250, 1255 (Wyo. 2012) (quoting Downing v. Stiles , 635 P.2d 808, 811 (Wyo. 1981) ) (internal citation omitted). The commercial frustration defense is not "available if the difficulties that frustrate the purpose of [the] contract ... reasonably could have been foreseen by the promisor when the parties entered into [the] contract. To apply the doctrine of commercial frustration, there must be a frustrating event not reasonably foreseeable[.]" 30 Williston on Contracts § 77:95 (4th ed.), Westlaw (database updated November 2018).
[¶76] The supervening event Mantles identify (ANB loan default because of FNB loan) was reasonably foreseeable. The district court found that Mr. Mantle, "as [P]resident of North Star, was primarily responsible for negotiating the loans with ANB," and he "signed the loan paperwork that contained [the violated loan covenants]." It also found "North Star was out of compliance with the debt to equity ratio [covenant] on several occasions, and bank personnel had numerous conversations with [Mr.] Mantle about the covenants[.]" Further, "[t]hese covenants were also discussed in various board meetings that were led by [Mr.] Mantle." The district court's findings of fact are not clearly erroneous. Mr. Mantle's performance is not excused under commercial frustration doctrine. The MOU is an enforceable contract. We affirm the district court's judgment in favor of the Garland entities in the amount of $6,110,000, with interest at 10%.
III. The district court did not err in concluding that the Garlands had failed to establish additional damages on their negligent misrepresentation claim
[¶77] The district court concluded "[t]he evidence did establish that [Mr.] Mantle and [Mr.] Killmer were in possession of financial information that showed that the $3,000,000.00 loan would not be enough to accomplish the buyout and make North Star profitable, but they did not share this information with FNB or with the member entities." The court concluded, however, that the defendants were not entitled to additional damages on their negligent misrepresentation counterclaim because they "did not establish that their damages from this misrepresentation differed from the damages they [sought] in their breach of contract claim." Because the court ruled on this claim following a bench trial, we review the court's conclusions of law de novo and defer to its factual findings *786 unless clearly erroneous. Galiher , 2018 WY 145, ¶ 6, 432 P.3d at 507.
[¶78] Mantles argue the district court erred in holding that Mr. Mantle's failure to share financial information with the members constituted negligent misrepresentation, because a failure to disclose information cannot support a claim for misrepresentation, citing Richey v. Patrick , 904 P.2d 798, 802 (Wyo. 1995). The record supports the district court's finding of fact that Mr. Mantle and Mr. Killmer made affirmative misrepresentations regarding North Star's projected $1 million of profitability for the remainder of 2014 at the "white board meeting." Further, we reject the implication in Mantles' argument that failure to disclose is always a defense to a negligent misrepresentation claim. In fact, "even if someone is not under a duty to speak, if he does speak, he is under a duty to speak truthfully and to make a full and fair disclosure." Claman , 2012 WY 92, ¶ 43, 279 P.3d at 1016 (emphasis omitted). Mr. Mantle's selective disclosure of the truth regarding North Star's finances does not absolve him of misrepresentation. However, we agree with the district court's conclusion that the Garlands have not established damages arising from such misrepresentation above their contract damages. A plaintiff " 'has the burden of producing sufficient evidence to prove his damages' and [ ] those damages must be established 'with a reasonable degree of certainty.' " Acorn v. Moncecchi , 2016 WY 124, ¶ 76, 386 P.3d 739, 761 (Wyo. 2016) (quoting Schlinger v. McGhee , 2012 WY 7, ¶ 12, 268 P.3d 264, 268 (Wyo. 2012) ). "A court may not resort to speculation or conjecture in determining the proper amount to award." Acorn , 2016 WY 124, ¶ 76, 386 P.3d at 761 (alteration omitted). We affirm on that basis.[13]
[¶79] The district court's finding that Mr. Mantle negligently misrepresented North Star's finances to the Garlands is not clearly erroneous. Its conclusion that the Garlands are not entitled to damages associated with that claim is affirmed.
IV. The district court correctly ordered there were no disputed issues of material fact to support Mantles' claim of actual fraud
A. The district court properly granted summary judgment on the Mantles' fraud claim
[¶80] The district court granted the Garlands' motion for summary judgment on Mantles' fraud claim, finding that they had not only failed to plead the claim with specificity, as required by W.R.C.P. 9(b), but they had also failed to plead any elements of a fraud cause of action. The court denied the Mantles' May 19, 2017, Motion to Amend Complaint to plead a new fraud claim because it was untimely and "appear[ed] to be an improper attempt to have the Court reconsider its ruling on the summary judgment motions."
[¶81] The Mantles premised their fraud claim on allegations the Garlands orchestrated the transfer of North Star assets with the intent to defraud creditors. These allegations may be sufficient to state a claim under the Uniform Fraudulent Transfer Act (UFTA), discussed infra , but they are insufficient to support a claim under Wyoming's common-law fraud cause of action. To prevail on a fraud claim, a plaintiff must prove by clear and convincing evidence that: (1) the defendant made a false representation intended to induce the plaintiff to act; (2) the plaintiff reasonably believed the representation was true; and (3) the plaintiff relied on the representation and suffered damages as a result. Action Snowmobile & RV, Inc. v. Most Wanted Performance, LLC , 2018 WY 89, ¶ 9, 423 P.3d 317, 321 (Wyo. 2018) ; Birt v. Wells Fargo Home Mortg., Inc. , 2003 WY 102, ¶ 42, 75 P.3d 640, 656 (Wyo. 2003) ; Bitker v. First Nat'l Bank in Evanston , 2004 WY 114, ¶ 12, 98 P.3d 853, 856 (Wyo. 2004) ;
*787 Sundown, Inc. v. Pearson Real Estate Co., Inc. , 8 P.3d 324, 330 (Wyo. 2000). W.R.C.P. 9(b) requires fraud to be alleged with particularity. Fraud is never presumed. Bitker , 2004 WY 114, ¶ 12, 98 P.3d at 856.
[¶82] Rather than assert the elements of fraud are present, the Mantles argue that "[a]ctual fraud, as a cause of action, ... does not require a misrepresentation[,]" relying on Husky Int'l Electronics, Inc. v. Ritz , --- U.S. ----, 136 S.Ct. 1581, 1586-87, 194 L.Ed.2d 655 (2016). There, the United States Supreme Court considered the meaning of "actual fraud" in Section 523(a)(2)(A) of the Bankruptcy Code, which provides an exemption to discharge in bankruptcy of debts "obtained by ... false pretenses, a false representation, or actual fraud[.]" Husky , --- U.S. ----, 136 S.Ct. at 1586-88. The Court held that " 'actual fraud' in § 523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation." Id . at 1586. The Husky court determined that a fraudulent conveyance, "although a 'fraud,' ... [is] not an inducement-based fraud." Id. at 1587. Although fraudulent conveyances are a form of fraud that can occur without a false representation, see Section V., infra , that does not change the elements of a common-law fraud cause of action. The Husky court's definition of "actual fraud" as applied to fraudulent transfers under the Bankruptcy Code does not displace the well-established elements of a fraud claim in this state.
[¶83] We agree with the district court that there are no disputed issues of material fact, and the Garlands were entitled to judgment as a matter of law on the fraud claim.
B. The district court did not abuse its discretion in denying the Mantles' motion to amend
[¶84] The Mantles argue they should have been allowed to amend their amended complaint to revise their fraud claim and that the district court abused its discretion in denying their motion to amend. "A district court is vested with broad discretion to determine whether to allow amendment to pleadings." Halling v. Yovanovich , 2017 WY 28, ¶ 22, 391 P.3d 611, 619 (Wyo. 2017). We will reverse that decision "only for an abuse of discretion shown by clear evidence." Halling , 2017 WY 28, ¶ 22, 391 P.3d at 619 (quoting Guy v. Lampert , 2015 WY 148, ¶ 14, 362 P.3d 331, 335 (Wyo. 2015) ). In determining whether a district court abused its discretion, "[o]ur touchstone inquiry ... is whether the trial court could have reasonably concluded as it did." Halling , 2017 WY 28, ¶ 22, 391 P.3d at 619 (quoting Gould v. Ochsner , 2015 WY 101, ¶ 39, 354 P.3d 965, 977 (Wyo. 2015) ).
In the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.-the leave sought should, as the rules require, be 'freely given.'
Halling , 2017 WY 28, ¶ 22, 391 P.3d at 619. Any one of these factors provides sufficient reason to deny a motion to amend. Halling , 2017 WY 28, ¶ 22, 391 P.3d at 619 (citing Retz v. Siebrandt , 2008 WY 44, ¶¶ 7-8, 181 P.3d 84, 88-89 (Wyo. 2008) ; Frank v. U.S. West, Inc. , 3 F.3d 1357, 1365 (10th Cir. 1993) ). We have found undue delay sufficient to justify denial of a motion to amend when a party requests leave to amend after a district court's summary judgment ruling. Halling , 2017 WY 28, ¶ 25, 391 P.3d at 620 ; Ekberg v. Sharp , 2003 WY 123, ¶ 14, 76 P.3d 1250, 1254-55 (Wyo. 2003). We have also found denial of leave to amend appropriate where "the complaint, as amended, ... would not survive a motion for summary judgment." Halling , 2017 WY 28, ¶ 26, 391 P.3d at 620 (quoting Watson v. Beckel , 242 F.3d 1237, 1239-40 (10th Cir. 2001) ).
[¶85] Several factors demonstrate the district court acted reasonably in denying the motion to amend. First, the Mantles' failure to appreciate that a fraud cause of action requires a misrepresentation shows that amendment would have been futile. Their proposed amendment continues to premise the fraud claim primarily on fraudulent *788 transfers.[14] Second, the Mantles did not move to amend their complaint until more than 11 months after the deadline to amend pleadings had passed. Thus, we hold the district court did not abuse its discretion in denying the motion to amend.
V. The district court correctly concluded that certain North Star conveyances were fraudulent and others were not
[¶86] A plaintiff does have recourse for the wrongful transfer of property in the absence of a misrepresentation. The Mantles contend that a number of conveyances made by North Star after the Garlands had taken over, and while North Star was insolvent, should be set aside as fraudulent conveyances. Wyoming adopted the Uniform Fraudulent Transfer Act (UFTA) in 2006. Unif. Fraudulent Transfer Act Refs. & Annos. (2018); 2006 Wyo. Sess. Laws ch. 55, § 1 (S.F. No. 39). The UFTA's purpose is to protect unsecured creditors from debtor transfers designed to frustrate debt-collection efforts. John E. Sullivan, III, Future Creditors and Fraudulent Transfers: When a Claimant Doesn't Have a Claim, When a Transfer Isn't a Transfer, When Fraud Doesn't Stay Fraudulent, and Other Important Limits to Fraudulent Transfers Law for the Asset Protection Planner , 22 Del. J. Corp. L. 955, 962 (1997) ; UFTA § 1, cmt. 3. It allows creditors to avoid such transfers to the extent necessary to satisfy the creditor's claims. UFTA § 7(a)(1) ; Wyo. Stat. Ann. § 34-14-208(a)(i) (LexisNexis 2017). "UFTA frequently parallels key passages of the United States Bankruptcy Code (the Code) ... which makes opinions under the Code a valuable source of interpretive case law." Sullivan, supra at 960. Thus, although Husky 's interpretation of "actual fraud" does not alter the elements of a common-law fraud cause of action, it is persuasive when considering a fraudulent transfer claim under the UFTA.
[¶87] The district court held most of the challenged transfers were not fraudulent under the UFTA but did award the Mantles judgment on some transfers from North Star to Gary and Ray. Following a bench trial, we review a district court's conclusions of law de novo and its findings of fact for clear error. Galiher , 2018 WY 145, ¶ 6, 432 P.3d at 507.
[¶88] The UFTA addresses two types of fraud-actual and constructive-and two types of creditors-present and future.[15] UFTA §§ 4, 5 ; Wyo. Stat. Ann. §§ 34-14-205 and 34-14-206 ; see also Sullivan, supra at 962-67 (explaining the UFTA's treatment of different types of fraud and creditors). To avoid a transfer under Wyo. Stat. Ann. § 34-14-205(a)(i), creditors must prove actual fraud by clear and convincing evidence. In re Phillips , 379 B.R. 765, 777 (Bankr. N.D. Ill. 2007) ; In re Jackson , 318 B.R. 5, 13 (Bankr. D. N.H. 2004).[16] The debtor's intent is the *789 touchstone of actual fraud. Sullivan, supra at 963-64; Roland v. United States , 838 F.2d 1400, 1402-03 (5th Cir. 1988) ("[T]he debtor's intent at the time of the conveyance was the crucial element. ... Under the intent test ..., whether [the debtor] was solvent at the time of the transfer is not dispositive."); see Breitenstine v. Breitenstine , 2003 WY 16, ¶ 18, 62 P.3d 587, 592 (Wyo. 2003) (stating that "[t]he determining factor" in whether a transfer is fraudulent is the transferor's intent at the time of the transfer) (decided under the UFCA). That said, because of the "virtual impossibility of proving actual fraudulent intent[,] ... this court and [others] have come to rely on inferences and presumptions drawn from the surrounding circumstances." Breitenstine , 2003 WY 16, ¶ 19, 62 P.3d at 592. Thus, insolvency and other circumstances surrounding a transaction may raise the inference that the transaction is fraudulent. Id. ; Sullivan, supra at 963-64. Such circumstances are referred to as "badges of fraud" and include:
lack or inadequacy of consideration, close familial relationship or friendship among the parties, retention of possession or benefit of the property transferred, the financial condition of the transferor both before and after the transfer, the chronology of events surrounding the transfer, the transfer takes place during the pendency or threat of litigations, and hurried or secret transactions.
Breitenstine , 2003 WY 16, ¶ 20, 62 P.3d at 593 ; see also Wyo. Stat. Ann. §§ 34-14-205(b)(i)-(xi) (codifying several badges of fraud relevant to determining actual intent). In considering a particular case's "badges of fraud," a court should evaluate the totality of the circumstances, including "all indicia negativing as well as suggesting fraud." Sullivan, supra at 971 (quoting UFTA § 4, cmt.6).
[¶89] In contrast to actual fraud, creditors bear the burden of proving constructive fraud by a preponderance of the evidence. In re Phillips , 379 B.R. at 778 ; In re Jackson , 318 B.R. at 13. The UFTA deems a transfer fraudulent despite a lack of fraudulent intent when a debtor does not receive
reasonably equivalent value in exchange for the transfer ... and the debtor:
(A) [w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
(B) [i]ntended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.
Wyo. Stat. Ann. 34-14-205(a)(ii). "Reasonably equivalent value" is not defined in the UFTA, but is generally understood to mean "something more than the consideration necessary to support a contract" but less than " 'dollar-for-dollar' equivalency." Peter A. Alces, Law of Fraudulent Transactions § 5:63, Westlaw (database updated March 2019) (citing In re Image Worldwide, Ltd. , 139 F.3d 574, 580 (7th Cir. 1998) ; In re Calvillo , 263 B.R. 214 (W.D. Tex. 2000) ). The reasonably equivalent value inquiry is "fundamentally one of common sense, measured against market reality." In re Northgate Comput. Sys. , 240 B.R. 328, 365 (Bankr. D. Minn. 1999). When measuring the value of a transaction, a court should consider both "direct" and "indirect" benefits, including "a wide range of intangibles such as: a [business's] goodwill or increased ability to borrow working capital; ... a [business's] ability to retain an important source of supply or an important customer[; and] a [business's] ability to remain in operation." In re Jumer's Castle Lodge, Inc. , 338 B.R. 344, 354 (C.D. Ill. 2006). The question of reasonably equivalent value should be evaluated as of the date of the transaction from the perspective of the creditors, meaning "the focus must be on what the debtor gave up and what it received in return that could benefit the creditors." Id. at 355 ; see also Alces, supra § 5:64;
*790 37 Am. Jur. 2d Fraudulent Conveyances and Transfers § 25, Westlaw (database updated February 2019). Courts commonly consider the following factors in determining reasonably equivalent value: "(1) whether the value of what was transferred is equal to the value of what was received; (2) the market value of what was transferred and received; (3) whether the transaction took place at arm's length; and (4) the good faith of the transferee." In re Jumer's Castle Lodge, Inc. , 338 B.R. at 354.
[¶90] Wyo. Stat. Ann. § 34-14-206 also deems certain transfers constructively fraudulent, although there are differences between it and Wyo. Stat. Ann. § 34-14-205(a)(ii). Wyo. Stat. Ann. § 34-14-206(b) does not require any consideration of reasonably equivalent value. Instead, it deems a transfer fraudulent when it is "made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent." Wyo. Stat. Ann. § 34-14-206(b). In the context of an unincorporated business organization, Wyo. Stat. Ann. § 34-14-202(a)(vii)(F) defines an insider as: "(I) A member, partner, manager or participant who has the right to conduct business of the organization; (II) A person who controls the organization; or (III) A relative of a person described in [ (I) ]." Section 206(b)'s "antecedent debt" requirement refers to a debt that arose "on account of some transaction that took place before the payment to the creditor[.]" Alces, supra § 6:18. In other words, "[c]ontemporaneous payments in exchange for goods or services are not voidable [under Wyo. Stat. Ann. § 34-14-206(b) ]." Id.
[¶91] Various defenses apply to allegedly fraudulent transfers, depending on the statutory section under which a party challenges a transfer. For example, transfers otherwise voidable under Wyo. Stat. Ann. § 34-14-206(b) are not voidable:
(i) To the extent the insider gave a new value to or for the benefit of the debtor after the transfer was made unless the new value was secured by a valid lien;
(ii) If made in the ordinary course of business or financial affairs of the debtor and the insider; or
(iii) If made pursuant to a good-faith effort to rehabilitate the debtor and the transfer secured present value given for that purpose as well as an antecedent debt[.]
Wyo. Stat. Ann. § 34-14-209(f). The ordinary course of business defense in Wyo. Stat. Ann. § 34-14-209(f) derives from § 547(c)(2) of the Bankruptcy Code, "which excepts certain payments made in the ordinary course of business or financial affairs from avoidance by the trustee in bankruptcy as preferential transfers." UFTA § 8, cmt. 6. There is no precise standard governing when a debtor's payments are in the ordinary course of business; instead, courts must undertake another "peculiarly factual" analysis. Lovett v. St. Johnsbury Trucking , 931 F.2d 494, 497 (8th Cir. 1991). Like the determination of actual fraudulent intent, the good-faith inquiry in sections 209(a) and (f)(iii) goes to state of mind, this time on the part of the transferee. In re Polaroid Corp. , 472 B.R. 22, 60 (Bankr. D. Minn. 2012). Good faith "is not susceptible of precise definition and is determined on a case-by-case basis." Id. (citing In re Sherman , 67 F.3d 1348, 1355 (8th Cir. 1995) ). Generally, if circumstances put a transferee on inquiry notice that the transferor may be attempting to defraud creditors or is insolvent, the transferee is not entitled to invoke any good-faith defense. In re Polaroid Corp. , 472 B.R. at 60 ; Alces, supra § 5:95 (citing cases). "The test is whether the transferee had notice or constructive knowledge of facts or circumstances which would induce an ordinarily prudent person to make inquiry as to the purpose of the transfer." 37 Am. Jur. 2d Fraudulent Conveyances and Transfers § 11, Westlaw (database updated February 2019).
A. 1401 Oil Drive Sale to GTI
[¶92] The district court held the sale of 1401 Oil Drive to GTI was not fraudulent because ANB had required immediate payment of the mortgage on the property; Mantles offered no evidence that North Star could have refinanced its mortgage without further violating the ANB covenants; Mr. Mantle and Mr. Killmer had proposed selling the property for less than its appraised value *791 just months before; selling the property allowed North Star to pay off the ANB note, pay off other debts, and remain in the Gillette shop for several months while contracts were finished; and the sale gave ANB confidence to continue working with the Garlands in extending the deadline to repay the remaining ANB loans, and paying off additional creditors.
[¶93] The district court's findings indicate that it considered factors that can serve as circumstantial evidence of actual intent. See Breitenstine , 2003 WY 16, ¶¶ 18-20, 62 P.3d at 592-93. In Breitenstine , we concluded the district court did not err in holding the transferor's actual intent was to hinder, delay, or defraud creditors based on its evaluation of the circumstances surrounding the transaction. Id. at ¶ 25, 62 P.3d at 594. In doing so, we recognized that the district court had "discretion to weigh the evidence and the credibility of the witnesses," and we did not find any of its factual findings clearly erroneous. Id. Similarly, the record supports the district court's factual conclusions here, and it did not err in finding a lack of actual fraudulent intent.
[¶94] As to constructive fraud under Wyo. Stat. Ann. § 34-14-205(a)(ii) and Wyo. Stat. Ann. § 34-14-206(a),[17] we adhere to the principle that determining reasonably equivalent value is a question of fact based on the circumstances of the case and, likewise, defer to the district court's findings of fact. Regardless of whether GTI was an insider, Wyo. Stat. Ann. § 34-14-206(b) does not apply because there is no antecedent debt here. GTI paid North Star in exchange for the building. Contemporaneous payments in exchange are not voidable under Wyo. Stat. Ann. § 34-14-206(b). We affirm the district court's conclusion that the transfer of 1401 Oil Drive was not a fraudulent conveyance.
B. Payments to Hot Iron
[¶95] The district court concluded several payments made to Hot Iron after the Garlands took over North Star's management were not fraudulent because they consisted of: (1) a mobilization fee for the City of Sheridan project, which was a bonded project that North Star did not have the equipment to perform and would have cost North Star millions of dollars if not performed; (2) a reimbursement for the costs of selling a crane that ultimately released North Star of its obligation under the crane lease; and (3) reimbursements for North Star payroll and health insurance, which allowed North Star to keep employees needed to complete contracts, avoiding additional debts for breached contracts and enabling North Star to earn money to pay additional creditors.
[¶96] The record supports the district court's conclusions concerning actual fraud and reasonably equivalent value. The district court considered circumstances surrounding the transactions that can serve as circumstantial evidence of actual intent. We have said that a "single badge of fraud may stamp a transaction fraudulent." Breitenstine , 2003 WY 16, ¶ 20, 62 P.3d at 593 (citing In re Reed's Estate , 566 P.2d at 589 ). The inverse is also true: a strong indication of a lack of fraudulent intent can weigh heavily in finding a lack of fraudulent intent. The district court had the discretion to give heavy weight to factors it found contrary to fraudulent intent in holding the mobilization fees and reimbursements were not paid to hinder, delay, or defraud. Likewise, we defer to the district court's factual findings supporting its determination that North Star received reasonably equivalent value in exchange for these transfers.
[¶97] The court did not address how Wyo. Stat. Ann. § 34-14-206(b) applied to these transfers. Hot Iron was a present, inside creditor of North Star, which was insolvent at the time of the transfers. Thus, the issue is whether the mobilization fee constituted an antecedent debt. We infer, from the court's conclusion that North Star received reasonably equivalent value, that it *792 considered the transaction an exchange of new value. In addition to not being an "antecedent debt," an exchange of new value implicates the defenses in Wyo. Stat. Ann. §§ 34-14-209(f)(i) (not voidable to the extent new value given) and 34-14-209(f)(iii) (good-faith effort to rehabilitate the debtor and the transfer secured present value given for that purpose as well as an antecedent debt). The Garlands' Demonstrative Exhibit B[18] supports the conclusion that new value was given, as it does not identify any dates on which antecedent debts for these transfers arose. Mantles provide us with no other evidence regarding these payments. Concerning the crane reimbursement, the Exhibit lists the "Date Transferred to/Paid on behalf of NS/Invoiced to NS" as 07/01/2015 and the date of repayment as 07/02/2015. As to the payroll and health insurance, the dates between the original payments and the "reimbursements" is slightly longer but, even if not strictly "new value," 34-14-209(f)(iii)'s good-faith rehabilitation defense applies because, as the district court found, these payments allowed the company to keep employees, thereby preventing additional debts for breached contracts and generating income to pay other creditors. Thus, we conclude the transfer was not voidable under Wyo. Stat. Ann. § 34-14-206(b) and affirm the district court's holding on the payments to Hot Iron.
C. Payments to Gary
[¶98] The district court concluded that a series of payments to Gary Garland totaling $120,167.00 were not fraudulent because they "were reimbursements for several payments that Gary made on North Star's behalf. Therefore, North Star did receive reasonable equivalent value for these payments." However, it concluded a remaining $250,000 of transfers fit the definition of fraudulent transfers, despite the Mantles' failure to prove fraudulent intent, because North Star did not receive reasonably equivalent value in exchange. Instead, the court found these payments were reimbursements for pledge funds not made in the ordinary course of business, at a time when the Garlands knew North Star could not satisfy its obligations and creditors.
[¶99] Gary contends that he, Ray, and Alex pledged funds
[o]n two occasions when ANB got worried about North Star's line of credit and required $500,000 be placed on deposit as additional security. The first pledge occurred in June of 2013. To fund the deposit Gary Garland contributed $250,000, Ray Garland contributed $75,000, and Alex Mantle contributed $125,000. The funds were finally released in March of 2015. The second pledge occurred in the spring of 2015.... While the 2015 pledge funds were returned directly to the managers, the 2013 pledge funds were first put into North Star and then paid to the managers at a later date.
[¶100] On appeal, Gary primarily argues the ordinary course of business exception applies. He argues: "contrary to the District Court's ruling, North Star certainly received reasonably equivalent value. The pledge funds allowed North Star to continue to draw on its line of credit, which had great value to North Star as [it] struggled with finances."
[¶101] Concerning actual fraud, the district court again considered some circumstances surrounding the transactions that can serve as circumstantial evidence of actual intent, including that the payments were reimbursements. In addition to giving deference to the district court's consideration of these circumstances, we consider that actual fraud requires proof by clear and convincing evidence. The Mantles did not meet that burden.
[¶102] Turning to constructive fraud, the district court apparently viewed "reimbursements" differently from "release of pledge funds." It held $120,167.00 of reimbursements were exchanged for reasonably equivalent value, while the released pledge funds were not. Apart from saying "[f]or reasons that [were] not quite clear, [the pledge] funds were not released directly to Gary, but instead went into North Star and then were paid to Gary in March of 2015," the court did *793 not explain its analysis as to reasonably equivalent value.
[¶103] Although courts should consider a wide range of indirect benefits in determining reasonably equivalent value, including "a [business's] increased ability to borrow working capital; ... [and] a [business's] ability to remain in operation," In re Jumer'sCastle Lodge, Inc. , 338 B.R. at 354, it is not clear that the pledge fund transfers to Gary could have accomplished anything of value to North Star when made in 2015. Considering that the question of reasonably equivalent value should be evaluated as of the date of the transaction from the creditors' perspective, it is difficult to discern what North Star could have received in return for the transfers to Gary that would be of any benefit to creditors. Gary does not explain how funds that had allowed North Star to continue to draw on its line of credit nearly two years earlier prolonged North Star's ability to remain in operation when repaid in 2015. These 2013 pledge fund payments are distinguishable from the 2015 pledge fund payments to ANB not only because the 2015 pledge funds were returned directly to the managers, but also because they contributed to ANB granting the Garlands additional time to pay back ANB loans, which allowed North Star to finish contracts and pay additional creditors.
[¶104] In contrast to the 2013 pledge funds, "reimbursement" transfers the district court found non-fraudulent seem to have benefitted at least some of North Star's creditors. Gary paid North Star invoices, a fee incurred in acquiring the Bank of Buffalo loan, North Star legal fees, and fees associated with the equipment auction. The invoices paid debts owed to creditors, the loan fee went to pay 2015 pledge funds that helped extend the time to repay ANB loans, and the auction generated income used to pay additional creditors. These factors support the district court's conclusion that reimbursements paid to Gary were exchanged for reasonably equivalent value, while the 2013 pledge fund payments were not.
[¶105] The court did not explicitly address how Wyo. Stat. Ann. § 34-14-206(b) applied to the payments of $250,000 to Gary. Gary was a present, inside creditor of North Star, which, as Gary knew, was insolvent at the time of the transfers. The district court apparently viewed the pledge funds owed to Gary since 2013 as an antecedent debt. This finding satisfies the requirements of Wyo. Stat. Ann. § 34-14-206(b) and triggers consideration of the defenses in Wyo. Stat. Ann. § 34-14-209(f).
[¶106] As noted, there is no precise standard governing when a debtor's payments are in the ordinary course of business; instead, courts must undertake a "peculiarly factual" analysis. Courts typically consider:
(1) the length of time the parties engaged in the type of dealing at issue; (2) whether the subject transfers were in an amount more than usually paid; (3) whether the payments at issue were tendered in a manner different from previous payments; (4) whether there appears to be an unusual action by the debtor or creditor to collect on or pay the debt; and (5) whether the creditor did anything to gain an advantage[.]
In re Forklift LP Corp. , 340 B.R. 735, 738-39 (Bankr. D. Del. 2006) ; Prairie Lakes Health Care System, Inc. v. Wookey , 583 N.W.2d 405, 416 (S.D. 1998). The district court considered those factors. In explaining why the ordinary course of business defense did not apply, the court noted North Star's insolvency, the managers' knowledge that North Star was insolvent, that this was only the second occasion where managers had been called upon to pledge funds and, while 2015 pledge funds had been returned directly to managers, the 2013 pledge funds were not. Gary argues that North Star Operating Agreement provisions authorizing members and managers to make short-term loans to North Star support the conclusion the transfer was done in the ordinary course of business. While these provisions may be some evidence that loans to North Star and subsequent repayment to members and managers were part of normal business operations, that is merely one factor. Despite the Operating Agreement, the district court found the transfers were unusually timed, lacked any historic analog, and were inexplicably released to North Star and then to Gary two years later. The record supports those findings *794 and the conclusions drawn from them. We affirm the district court's holdings on the payments to Gary Garland.
D. Payments to Ray
[¶107] The district court held $115,000 of payments to Ray Garland were not fraudulent, because they were reimbursements for North Star legal fees and payroll expenses. However, it held $307,000 of payments to him were fraudulent transfers because North Star did not receive reasonably equivalent value in exchange for them. These transfers consisted of reimbursements for 2013 pledge funds and payments towards Ray's 2013 North Star tax obligation.[19]
[¶108] Largely, the same analysis applies to Ray as applies to Gary. We again defer to the district court's consideration of circumstances evidencing a lack of actual fraudulent intent and its conclusion that the Mantles did not prove actual fraudulent intent by clear and convincing evidence. The payments for North Star legal fees and payroll expenses were reimbursements for recent expenses Ray had paid on North Star's behalf in attempts to keep the company afloat, which again would have benefitted at least some of North Star's creditors. The repayment to Ray of North Star's 2013 tax obligation is similar to the 2013 pledge fund payment to Gary and subject to similar reasoning. Repaying North Star's tax obligations to Ray did not prolong North Star's life in 2015, or do anything to benefit North Star's creditors. And again, we cannot conclude that these payments were made in the ordinary course of business, given that North Star did not pay the tax obligations for its members "on a consistent basis, and it often stopped making these payments when it was having cash flow issues." Thus, we affirm the district court's holdings on the payments to Ray Garland.[20]
E. Payments to MGM
[¶109] The court held a series of payments totaling $70,971.21 from North Star to MGM were not fraudulent conveyances because they were payment for work MGM performed on North Star projects on North Star's behalf. As with the payments to Hot Iron, the record supports the district court's conclusions concerning actual fraud and reasonably equivalent value. The payments to MGM were for work done on North Star's behalf that North Star did not have the equipment to perform. MGM's work avoided additional North Star losses, enabling North Star to pay additional creditors. Likewise, we find these payments were not voidable under Wyo. Stat. Ann. § 34-14-206(b), because they constituted an exchange of new value. We affirm the district court's holding on the payments to MGM.
F. Transfer of 16 Pickups to WyoDak
[¶110] The district court granted WyoDak's motion for summary judgment on the Mantles' fraudulent transfer claim and dismissed WyoDak from the case. "Summary judgment is proper only when there are no genuine issues of material fact, and the prevailing party is entitled to judgment as a matter of law." Bogdanski v. Budzik , 2018 WY 7, ¶ 18, 408 P.3d 1156, 1160 (Wyo. 2018) (quoting Uinta County v. Pennington , 2012 WY 129, ¶ 11, 286 P.3d 138, 141-42 (Wyo. 2012) ).
The party requesting summary judgment bears the initial burden of establishing a prima facie case that no genuine issue of material fact exists and that summary judgment should be granted as a matter of law. W.R.C.P. 56(c) ;
*795 Throckmartin v. Century 21 Top Realty , 2010 WY 23, ¶ 12, 226 P.3d 793, 798 (Wyo. 2010). Until the movant has made a prima facie showing that there are no genuine issues of material fact, the nonmovant has no obligation to respond to the motion with materials beyond the pleadings. Id.
Once a prima facie showing is made, the burden shifts to the party opposing the motion to present evidence showing that there are genuine issues of material fact. Boehm v. Cody Cntry. Chamber of Commerce , 748 P.2d 704, 710 (Wyo. 1987) (citing England v. Simmons , 728 P.2d 1137, 1140-41 (Wyo. 1986) ). The party opposing the motion must present specific facts; relying on conclusory statements or mere opinion will not satisfy that burden, nor will relying solely upon allegations and pleadings. Boehm , 748 P.2d at 710. However, the facts presented are considered from the vantage point most favorable to the party opposing the motion, and that party is given the benefit of all favorable inferences that may fairly be drawn from the record. [ Union Pacific R. Co. v. ] Caballo Coal Co. , ¶ 12, 246 P.3d [867] at 871 [ (Wyo. 2011) ].
Bogdanski , 2018 WY 7, ¶ 18, 408 P.3d at 1160-61 (quoting Johnson v. Dale C. , 2015 WY 42, ¶¶ 13-14, 345 P.3d 883, 887 (Wyo. 2015) ) (alterations in original). If the plaintiff's burden at trial is higher than a preponderance of the evidence, its burden in opposing summary judgment is also higher. Laird v. Laird , 597 P.2d 463, 466 (Wyo. 1979) ("Against the backdrop of a motion for summary judgment, fraud must be demonstrated in a clear and convincing manner."). "This Court affords no deference to the district court's ruling [on a motion for summary judgment], but instead reviews a 'summary judgment in the same light as the district court, using the same materials and following the same standards.' " Bogdanski , 2018 WY 7, ¶ 18, 408 P.3d at 1161 (quoting Hurst v. Metro. Prop. & Cas. Ins. Co. , 2017 WY 104, ¶ 8, 401 P.3d 891, 895 (Wyo. 2017) ).
[¶111] The district court found WyoDak had presented sufficient evidence to show no genuine issues of material fact existed on the fraudulent transfer claim because it presented evidence that it entered into an arm's length transaction with an independent third party and paid North Star reasonably equivalent value for the trucks. Thus, it shifted the burden to the Mantles, requiring them to rebut that showing by citing to particular portions of the record that raised material issues of fact. It held they did not meet that burden, in part, because they "did not present any evidence that North Star had more equity in these trucks than it received from the transaction or that North Star would have been able to get more than $125,000.00 if the trucks had been repossessed by Enterprise and sold to another company." On appeal, the Mantles do not identify which section of the UFTA they would apply to avoid the truck transfer, but alternatively allege "fraud" and a lack of "reasonably equivalent value."[21]
[¶112] WyoDak presented evidence of its lack of fraudulent intent and North Star's receipt of reasonably equivalent value. At his deposition, Chris Knudson, former North Star employee and one of the founding members of WyoDak, described the circumstances of acquiring the 16 trucks:
Enterprise was calling to repossess the trucks because North Star was behind, and that's when we were looking to start Wyo[D]ak and thought maybe we could make a deal and put that together. ... It was ... when North Star was primarily operating to an auction then. ... It wasn't conducting viable business.
He and Chris Whitney, a WyoDak employee, negotiated directly with Enterprise because Enterprise was repossessing the vehicles, and together they reached an agreement with Enterprise to pay off what North Star owed on the trucks. He testified that once the sale of similar vehicles at the equipment auction revealed that the trucks had a higher value than WyoDak had paid Enterprise, WyoDak paid North Star the difference. Gary calculated the difference in value between the price paid to Enterprise and the *796 trucks' value at auction. According to Mr. Knudson, WyoDak paid North Star the $125,000 difference because they "tried to do everything as fair and honorable as [they could] from the start. [They did not] ask[ ] for anything that wasn't accounted for and just. ... [They] felt there was more value, as demonstrated at the auction, so [they] paid it."
[¶113] Josh Miller, another former North Star employee and founding member of WyoDak, testified at his deposition that WyoDak paid North Star additional money even though it acquired the trucks from Enterprise "[s]o we didn't have to sit here and answer why we didn't [pay fair market value] now" and that they "just wanted to make sure that [they] were paying fair market value for the equipment" because he liked "to operate the business so you don't have to look back. So everything's straightforward, everything's answered for, everything's accounted for ... when questions come up, yes, we paid fair market value; yes, we can show you what we paid for the item."
[¶114] WyoDak employee Lori Zink testified at her deposition that she didn't know why WyoDak needed to pay North Star other than "it was ... the right thing to do." Finally, Gary Garland testified at his deposition that "[WyoDak] bought ... 16 pickups and roustabout trucks." They paid Enterprise less than the value of the pickups. "The members of North Star decided that 125,000 extra dollars for those trucks would be justified as a correct selling price for those trucks. I loaned Wyo[D]ak $125,000 and they paid North Star that additional money[.]" He stated he believed "[i]t was a fair deal after [WyoDak] paid the 125,000."
[¶115] To counter WyoDak's motion, the Mantles presented evidence of the trucks' Kelly Blue Book values. They asserted "NS effectively surrendered these vehicles to WyoDak ... [for] a fraction of their value."
[¶116] That North Star did not receive Blue Book value for the trucks does not establish fraud (actual or constructive) or counter WyoDak's showing of good faith. As to actual fraud under Wyo. Stat. Ann. § 34-14-205(a)(i), the Mantles would have been required to show fraudulent intent at trial by clear and convincing evidence. In re Phillips , 379 B.R. at 777. Thus, the Mantles had a higher burden in opposing WyoDak's motion for summary judgment on the actual fraud claim. See Laird , 597 P.2d at 466. North Star's receipt of less than Blue Book value simply does not meet that burden. As for constructive fraud, Blue Book value is not sufficient to establish reasonably equivalent value which does not require " 'dollar-for-dollar' equivalency." Alces, supra § 5:63 (citing In re Image Worldwide, Ltd. , 139 F.3d at 580 ; In re Calvillo , 263 B.R. 214 ). Instead, the question of reasonably equivalent value is "fundamentally one of common sense, measured against market reality[.]" In re Northgate Comput. Sys. , 240 B.R. at 365. When measuring the value of a transaction, a court should consider both "direct" and "indirect" benefits, including "a wide range of intangibles[.]" In re Jumer's Castle Lodge, Inc. , 338 B.R. at 354. The district court did precisely that and correctly concluded the Mantles failed to show North Star could have received more value for the trucks. Further, WyoDak presented evidence that it acted in good faith. Despite reaching an agreement with Enterprise-the owner of the trucks-that WyoDak could purchase the trucks by paying off North Star's remaining lease balances, WyoDak paid North Star an additional $125,000. Mr. Knudson, Mr. Miller, and Ms. Zink each explained WyoDak paid North Star this additional amount because it was "fair," "straightforward," and "the right thing to do." The Mantles did not offer any evidence to counter these assertions. Under Wyo. Stat. Ann. § 34-14-209(a) transfers are not voidable against transferees who take in good-faith and for reasonably equivalent value. We affirm the district court's grant of summary judgment on the fraudulent transfer claim against WyoDak.[22]
*797 VI. Equitable affirmative defenses are not available to the Garlands
[¶117] The Garlands contend on appeal the district court erred when it concluded their equitable estoppel and unclean hands claims were "really equitable defenses to Mantle[s'] claims. Because the Court has found that Mantle[s are] only entitled to a judgment against North Star, who has been defaulted, it is unnecessary to address these claims." They contend the defense of equitable estoppel should have been applied to the fraudulent conveyance judgments against them. Although we agree the equitable defenses might be applicable to fraudulent conveyance claims, in these circumstances, they are not available to the Garlands.
[¶118] " 'One of the basic tenets of equity is that equitable remedies depend upon a showing by the claimant of clean hands.' " McNeill Family Tr. v. Centura Bank , 2003 WY 2, ¶ 16, 60 P.3d 1277, 1284 (Wyo. 2003) (citing Fremont Homes, Inc. v. Elmer , 974 P.2d 952, 959 (Wyo. 1999) ; Dewey v. Wentland , 2002 WY 2, ¶ 37, 38 P.3d 402, 416 (Wyo. 2002) ) (alteration omitted). There is no fixed standard for conduct that amounts to unclean hands, "other than that it is conduct which the court regards as inequitable." Henry L. McClintock, Handbook of the Principles of Equity § 26, at 62 (2d ed. 1948). However, "[a]lmost always the violation of any statute will make a party's hands unclean." Id. And, generally, "[e]quity will not aid persons to obtain relief from situations which result from the conveyance of their property in fraud of creditors." 30A C.J.S. Equity § 117, Westlaw (database updated March 2019). In equity, "[t]he effect of constructive fraud is the same as of actual fraud." James W. Eaton, Handbook of Equity Jurisprudence §§ 121, 129, pp. 287, 306-07 (1901); see also John W. Smith, The Equitable Remedies of Creditors in Relation to Fraudulent Conveyances, Transfers, Mortgages, Judgments and Assignments § 11, at 20-21 (1899) ("A court of equity is sometimes called a court of conscience, and will not look upon fraud, in whatsoever guise it may appear, with any degree of toleration.").
[¶119] However, equity is highly discretionary and adaptable to the circumstances of a particular case, and the clean hands maxim is not a binding rule. Some courts have granted equitable relief to parties who have participated in fraudulent conveyances. For example, in Bovard v. Bovard , 352 Mo. 953, 180 S.W.2d 592, 595-96 (1944), the court affirmed a decision setting aside a deed and assignment of property, even though the party seeking this relief had transferred the property to protect it from creditors. The court noted that the transferor was seventy years old, nearly deaf, poor, and had transferred the property after the appellant had told him someone was seeking a debt from him and told him he could protect the property by transferring it to the appellant. Id. at 593-94. The court acknowledged the clean hands maxim but, finding there was in fact no creditor asserting a claim against him, stated the maxim does not apply to every situation and that "[t]he conduct of the other party may preclude its application." Id. at 596. The court refused to apply the maxim because it would have been a "gross injustice" to allow one to "[take] advantage of his position as administrator of the estate, his superior knowledge of the situation, and also the confidence [the transferor] imposed in him." Id. Additionally, scholars recognize that courts need not strictly adhere to the maxim when
there are collateral and incidental circumstances attending the transaction, and affecting the relations of the two parties, which render one of them comparatively free from fault. Such circumstances are imposition, oppression, duress, threats, undue influence, taking advantage of necessities or of weakness, and the like, as a means of inducing the party to enter into the agreement, or of procuring him to execute and perform it.
2 John N. Pomeroy, Equity Jurisprudence § 942, at 2001 (4th ed. 1918).
[¶120] While it could be argued the Garlands might never have been in a position where they resorted to the fraudulent conveyance of property without Mr. Mantle's orchestration, the Garlands are experienced business owners. There was no duress or undue influence. And, although Mr. Mantle certainly played a role in creating the circumstance *798 that led to the conveyances, he did not directly induce the Garlands to fraudulently convey property for his benefit, as occurred in Bovard .
[¶121] The principle that one who seeks equity must come with clean hands applies to bar the Garlands' equitable affirmative defenses. We affirm the district court's rejection of those defenses, though on different grounds.
VII. The district court correctly concluded the elements necessary for LLC veil-piercing were absent
[¶122] In its Order on Summary Judgment Motions, the district court granted summary judgment on the Mantles' alter-ego claim against the Garlands individually because they failed to show "any facts that would allow them to pierce the corporate veils of the member entities to reach the Garlands as individuals,"[23] and it granted summary judgment to WyoDak on the alter-ego claim against it. The court determined there were questions of fact regarding piercing the veils of the member entities, precluding summary judgment in favor of Hot Iron, Three Way, and MGM.
[¶123] The district court concluded in its Order After Bench Trial that the LLC veil-piercing factors set forth in GreenHunter Energy, Inc. v. Western Ecosystems Tech. , 2014 WY 144, 337 P.3d 454 (Wyo. 2014) did not warrant piercing North Star's LLC veil. The district court found the Mantles did not prove any actual fraud and the fraudulent conveyances it had found did not constitute fraud for purposes of veil-piercing because there was no fraudulent intent behind those transfers. The court concluded North Star was not undercapitalized from its inception, despite its cash-flow problems. It also concluded "[i]t was only after Mantle took over that ... formalities were not followed," and that "Mantle cannot ... use his own misconduct as an excuse to pierce the LLC veil." Finally, the court found that Mantles failed to prove North Star's finances were so intermingled with those of the member entities that there was no distinction between them. Thus, the court refused to pierce North Star's veil, saying the Mantles had "failed to prove that a single veil piercing factor [was] present."
A. Member Entities
[¶124] Following a bench trial, "[a] district court's conclusions of law are subject to de novo review. We review findings of fact to determine if they are clearly erroneous when compared to the record." GreenHunter , 2014 WY 144, ¶ 11, 337 P.3d at 459 (internal citation omitted).
[¶125] The Mantles argue the district court erred as a matter of law and fact in refusing to pierce North Star's veil to reach the member entities because: (1) it should have considered the constructive fraud resulting from the member entities' fraudulent transfers; (2) North Star was undercapitalized "starting at least when the Garlands took back management of [North Star]"; (3) North Star did not observe required formalities, as evidenced by the sole "corporate minutes or resolutions ... after ... the Garlands resumed day-to-day control"; and (4) North Star intermingled its finances with the member entities, as evidenced by: (a) "the manner in which Hot Iron's and [North Star's] payroll and employees overlapped in the spring of 2015"; (b) "the payment of both entities' expenses without regard to which entity it came from"; (c) "[North Star's] payment of the Managers' personal loan at Bank of Buffalo"; (d) the members' payment of North Star's legal fees; and (e) Hot Iron doing North Star's bookkeeping and billing in 2015.
[¶126] Certain business entities, such as corporations and LLCs, are separate and distinct from their owners. GreenHunter , 2014 WY 144, ¶ 12, 337 P.3d at 459 (citing Kaycee Land and Livestock v. Flahive , 2002 WY 73, ¶ 4, 46 P.3d 323, 325 (Wyo. 2002) ; Wyo. Stat. Ann. § 17-29-104 (LexisNexis 2013) ). Generally, this separateness of identity insulates the entity's owners from personal liability for the entity's obligations, *799 liabilities, and debts. 1 Fletcher Cyc. Corp. § 14, Attributes of a corporation-Distinctness of corporate from individual rights and liabilities; insulation from personal liability , Westlaw (database updated September 2018); Mark A. Sargent & Walter D. Schwidetzky, Limited Liability Company Handbook § 1:3 (2008). However, "that protection does not extend to behavior resulting in injustice." GreenHunter , 2014 WY 144, ¶ 12, 337 P.3d at 459. To avoid injustice, the common law "allowed courts to pierce the veil of limited liability" in exceptional circumstances. Id. at ¶ 13, 337 P.3d at 459. Piercing the veil to impose liability on the owners of a business entity is an equitable remedy, thus, the ultimate conclusion as to whether to pierce the veil is a question of law for the court. 1 Fletcher Cyc. Corp. § 41.25, Equitable basis of remedy , Westlaw (database updated September 2018). However, the veil-piercing analysis is "fact-driven and flexible." GreenHunter , 2014 WY 144, ¶ 28, 337 P.3d at 463 ; Opal Mercantile v. Tamblyn , 616 P.2d 776, 778 (Wyo. 1980).
[¶127] In GreenHunter , we found the 2010 Wyoming Limited Liability Company Act afforded limited liability companies "even greater flexibility and informality" and, thus, "[f]ailure of a limited liability company to adhere to the formalities required of a corporation is not a basis for disregarding the company in an action seeking to pierce its veil." Id. at ¶ 25, 337 P.3d at 462. We held that under the act, a limited liability company's veil could still be pierced in extraordinary circumstances but refined and restated a two-part veil-piercing test:
(1) the limited liability company is not only owned, influenced and governed by its members, but the required separateness has ceased to exist due to misuse of the limited liability company; and (2) the facts are such that an adherence to the fiction of its separate existence would, under the particular circumstances, lead to injustice, fundamental unfairness, or inequity.
Id. at ¶ 27, 337 P.3d at 462. In determining whether the two prongs have been met, we said courts should consider various factors, including fraud, inadequate capitalization, and the degree to which the business and finances of the company and the member are intermingled. Id. at ¶¶ 29-33, 337 P.3d at 463-64.[24]
[¶128] Undercapitalization is a factor to consider in LLC veil-piercing analysis, but the weight we give it depends on the degree of undercapitalization and the reason for it. Id. at ¶ 31, 337 P.3d at 463 ; Gasstop Two, LLC v. Seatwo, LLC , 2010 WY 24, ¶ 11, 225 P.3d 1072, 1077-78 (Wyo. 2010). It is a "relative concept" the weight of which "[depends] on the particular circumstances of the case." GreenHunter , 2014 WY 144, ¶ 32, 337 P.3d at 463. In GreenHunter , we found the LLC was undercapitalized because "when [the plaintiff's] invoices were submitted to the LLC, it often had no money in its operating account, and ... it received periodic money transfers from [its member], which decided how much money would be transferred to the LLC to pay specific bills it decided to pay, and when." 2014 WY 144, ¶ 41, 337 P.3d at 465. "Put another way, the LLC was continually undercapitalized by choice, not by external forces[.]" Id. at ¶ 43, 337 P.3d at 466. In contrast, any undercapitalization in Gasstop was a result of "the lack of the success of the business," which "operated for approximately two years at a loss" due to "the poor location, lack of customers and poor traffic count." 2010 WY 24, ¶ 11, 225 P.3d at 1077. There, we found "no evidence to pierce the LLC veil" and affirmed the district court's judgment. Id. at ¶¶ 11-12, 225 P.3d at 1079.
[¶129] Intermingling of assets, business operations, and finances is also insufficient to justify piercing the veil standing alone. GreenHunter , 2014 WY 144, ¶ 33, 337 P.3d at 464. In GreenHunter , we cited the following facts as supporting a finding of intermingling: (1) the LLC used its member's accounting department and the same accountants *800 managed the finances of both entities; (2) the entities had the same business address and creditors of the LLC mailed their invoices to the member's address for processing; (3) the LLC's tax returns were consolidated with the tax returns of the member; (4) the LLC did not have any employees independent of the member and the member directly paid its employees for work done for the LLC; (5) the LLC had no revenue separate from the member; (6) the member manipulated the assets and liabilities such that the member reaped all benefits of the LLC's activities while the LLC was saddled with all losses and liabilities. Id. at ¶ 45, 337 P.3d at 467.
We have made clear that each case involving the disregard of the separate entity doctrine must be governed by the special facts of that case and the district court must complete a fact-intensive inquiry and exercise its equitable powers to determine whether piercing the veil is appropriate under the circumstances presented.
Id. at ¶ 28, 337 P.3d at 463 (quoting Kaycee Land and Livestock , 2002 WY 73, ¶ 14, 46 P.3d at 328 ) (alterations omitted).
[¶130] The district court, applying GreenHunter , found that none of the LLC veil-piercing factors existed. First, although it "held that some of the transfers did meet the technical definition of a fraudulent transfer, Plaintiffs failed to meet their burden of showing there was any fraudulent intent behind the transfers." "Constructive fraud may be an alternative to actual fraud in certain circumstances" and is defined as "consisting of all acts, omissions, and concealments involving breaches of a legal or equitable duty resulting in damage to another." GreenHunter , 2014 WY 144, ¶ 30, 337 P.3d at 463.[25] However, given veil-piercing's "fact-driven," "flexible" inquiry that depends so heavily "on the particular circumstances" and "special facts" of the case, we cannot conclude a court's hands are tied when it finds technical violation of a statute, but no fraudulent intent. Implicit in the district court's conclusion that the fraudulent transfers did not warrant veil-piercing is the conclusion that no injustice would result from refusing to pierce the veils of the member entities, and we have said "an injustice or unfairness must always be proven." Id. at ¶ 34, 337 P.3d at 464. We agree with the district court that Mr. Mantle cannot use his own misconduct to pierce the corporate veil, and we conclude it did not err in finding that, under the circumstances of this case, there was no fraud to warrant veil-piercing.
[¶131] The district court further found that North Star was not undercapitalized from its inception. It had significant assets, though it was plagued with cash flow problems. The court said, "[i]t was only under [Mr.] Mantle's mismanagement that North Star became insolvent." Similarly, the district court held the Mantles had not proven North Star failed to maintain LLC formalities until after Mr. Mantle took over. The district court, perhaps implicitly, applied the doctrine that a party who seeks the equitable remedy of piercing the LLC veil must come with clean hands. Or, it simply shared this Court's view that "it is unseemly to beg for equitable relief based upon one's own wrongdoing." Martinez v. Assoc. Fin. Services Co. of Colorado, Inc. , 891 P.2d 785, 789 (Wyo. 1995).
[¶132] Finally, the district court found North Star's finances were not so intermingled with those of its member entities "that there was no distinction between them." Its finding that the entities maintained separate existences is supported by the record. "North Star had its own employees, bank accounts, lines of credit, revenue, etc." When the member entities advanced funds or services to North Star, they were properly accounted for. In contrast to the shell company in GreenHunter , the members did not intentionally keep North Star's accounts zeroed out. The district court's conclusion the LLC veil should not be pierced is affirmed.
B. WyoDak veil-piercing
[¶133] We apply our summary judgment standard of review to the district *801 court's decision on Mantles' WyoDak veil-piercing claim. "Summary judgment is proper only when there are no genuine issues of material fact, and the prevailing party is entitled to judgment as a matter of law." Bogdanski , 2018 WY 7, ¶ 18, 408 P.3d at 1160 (quoting Pennington , 2012 WY 129, ¶ 11, 286 P.3d at 141-42 ). Although veil-piercing is a fact-intensive inquiry generally not suited for summary judgment, "summary judgment may be granted in a proper case where no genuine issue of fact is raised or shown." Atlas Const. v. Slater , 746 P.2d 352, 355 (Wyo. 1987) (quoting 1 Fletcher Cyc. Corp. § 41.95, p. 462 (C. Swearingen Ed. 1983) ). The analysis of the alter-ego claim against WyoDak also differs from the analysis we apply to the other entities, because WyoDak had no ownership interest in North Star. We agree with the district court that Mantles "did not present any evidence ... that WyoDak exercised any control over North Star," and we affirm its grant of summary judgment in WyoDak's favor on that basis.
[¶134] The Mantles have failed to address WyoDak's lack of ownership interest in North Star and how that fact bears on veil-piercing analysis. They "seek[ ] to impose liability upon a [business entity] that holds no ownership interest in the [business entity] that allegedly committed the wrongful acts." Minno v. Pro-Fab, Inc. , 121 Ohio St.3d 464, 905 N.E.2d 613, 617 (2009). In Minno , the Ohio Supreme Court held that "[a] corporation's veil may not be pierced in order to hold a second corporation liable for the corporate misdeeds of the first when the two corporations have common individual shareholders but neither corporation has any ownership interest in the other[.]" Id. The court noted that veil-piercing doctrine applies to determine "whether an individual shareholder may be held liable for corporate wrongdoings" and "whether a parent corporation could be held liable for its subsidiary corporation's misconduct." Id. However, "[t]he common element in both of these situations is that the party upon whom liability is sought to be imposed had a controlling interest through ownership of ... stock in the corporation allegedly committing wrongful acts." Id. The court reasoned:
In contrast to a shareholder's ownership of a corporation or a parent corporation's ownership of another corporation, the common shareholder ownership of sister corporations does not provide one sister corporation with the inherent ability to exercise control over the other. Any wrongful act committed by one sister corporation might have been instigated by the corporation's owners, but it could not have been instigated by the corporation's sister.[26]
Id. ; see also Molinos Valle Del Cibao, C. por A. v. Lama , 633 F.3d 1330, 1351 (11th Cir. 2011) (under Florida law a plaintiff was not permitted to pierce the corporate veil against a non-shareholder director); Thibodeau v. Cole , 740 A.2d 40, 42 (Me. 1999) (only shareholders may be held liable when piercing the corporate veil); Allred v. ExceptionalLandscapes, Inc. , 227 N.C.App. 229, 743 S.E.2d 48, 53-54 (N.C. 2013) (refusing to pierce the veil to reach a non-shareholder). Although some courts have held that "ownership, while important, is not a necessary prerequisite to pierce the corporate veil-it is merely one factor to consider[,]" Lunneborg v. My Fun Life , 163 Idaho 856, 421 P.3d 187, 203 (2018), they do so only after finding the non-owner in question exercises a high degree of control over the business entity. Id. ("when a claimant seeks to hold a non-shareholder liable for corporate debts, the court may look to a range of evidence to consider whether fairness dictates allowing recovery against a non-shareholder-officer, with the primary consideration being the element of control or influence exercised by that person").
[¶135] Because Mantles provide no argument for extending our veil-piercing jurisprudence to an LLC that had no ownership interest or control of the entity whose veil they seek to pierce, we will not do so. See Whitham v. Feller , 2018 WY 43, ¶ 25, 415 P.3d 1264, 1270 (Wyo. 2018). The district court's conclusion that WyoDak was entitled to judgment as a matter of law is affirmed.
*802 VIII. North Star's members do not have a fiduciary duty to the company's creditors
[¶136] The district court granted summary judgment in favor of the Garlands on the Mantles' claim that the managers of North Star breached their fiduciary duties to its creditors, holding that Wyoming has not recognized such a duty, and that, under North Star's Operating Agreement, the members and managers owed a fiduciary duty to North Star, and not to its creditors. The parties agree the standard of review is de novo. Sullivan v. Pike & Susan Sullivan Found. , 2018 WY 19, ¶ 15, 412 P.3d 306, 310 (Wyo. 2018).
[¶137] The Mantles rely on cases from other jurisdictions recognizing that managers and directors of insolvent corporations owe fiduciary duties to the corporations' creditors. They urge this Court to apply the "deepening insolvency" theory of liability, which permits damages for the fraudulent prolongation of the life of an insolvent corporation. The Mantles allege that the Garlands deepened North Star's insolvency by diverting North Star cash and contracts to themselves and other entities, thereby breaching their fiduciary duties to North Star's creditors, including the Mantles. However, the Mantles do not attempt to persuade this Court either how this corporate law theory translates to an LLC, or why such a claim need not be brought as a derivative action.
[¶138] Although Wyoming has not addressed whether the principals of an insolvent corporation owe fiduciary duties to the corporation's creditors, numerous courts have done so. Prod. Res. Grp., LLC v. NCT Grp., Inc. , 863 A.2d 772, 791 (Del. Ch. 2004) ; Alexander v. Anstine , 152 P.3d 497, 502 (Colo. 2007) ; Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp. , 778 F.Supp. 1116, 1125 (D. Colo. 1991) ; Technic Eng'g v. Basic Envirotech, Inc. , 53 F.Supp.2d 1007, 1011 (N.D. Ill. 1999) ; Mitchell v. Lyons Prof.Serv., Inc. , 109 F.Supp.3d 555, 570 (E.D. N.Y. 2015) ; Paul H. Schwendener v. Jupiter Elec. Co., Inc. , 358 Ill.App.3d 65, 293 Ill.Dec. 893, 829 N.E.2d 818, 828 (2005) ; In re Healthco Intern., Inc. , 208 B.R. 288, 300 (Bankr. D. Mass. 1997) ; In re Thompson , 686 F.3d 940, 946 (8th Cir. 2012) ; ASARCO LLC v. Americas Mining Corp. , 396 B.R. 278, 395 (S.D. Tex. 2008) ; In re Northstar Dev. Corp. , 465 B.R. 6, 16-17 (Bankr. W.D. N.Y. 2012) ; In re Ontos, Inc. , 478 F.3d 427, 432 (1st Cir. 2007) ; Carrieri v. Jobs.com Inc. , 393 F.3d 508, 534 n.24 (5th Cir. 2004) ; Fed. Deposit Ins. Corp. v. Sea Pines Co ., 692 F.2d 973, 976-77 (4th Cir. 1982) ; PCS Nitrogen, Inc. v. Ross Dev. Corp. , 126 F.Supp.3d 611, 621 (D. S.C. 2015) ; In re Southwest Supermarkets, LLC , 376 B.R. 281, 285 (Bankr. D. Ariz. 2007).
[¶139] Several courts have followed the Delaware Supreme Court's lead in requiring that claims of breach of fiduciary duties to creditors of insolvent corporations be brought as derivative actions. In N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla , 930 A.2d 92, 94 (Del. 2007), the Supreme Court of Delaware held that the creditors of an insolvent Delaware corporation had no right to assert direct claims for breach of fiduciary duty against the corporation's directors. The court reasoned:
At all times, claims of this kind belong to the corporation itself because even if the improper acts occur when the firm is insolvent, they operate to injure the firm in the first instance by reducing its value, injuring creditors only indirectly by diminishing the value of the firm and therefore the assets from which the creditors may satisfy their claims.
Id. at 102 (quoting Prod. Res. Grp., LLC , 863 A.2d at 776 ). Further,
[r]ecognizing that directors of an insolvent corporation owe direct fiduciary duties to creditors[ ] would create uncertainty for directors who have a fiduciary duty to exercise their business judgment in the best interest of the insolvent corporation. To recognize a new right for creditors to bring direct fiduciary claims against those directors would create a conflict between those directors' duty to maximize the value of the insolvent corporation for the benefit of all those having an interest in it, and the newly recognized direct fiduciary duty to individual creditors. Directors of insolvent corporations must retain the freedom to engage in vigorous, good faith negotiations *803 with individual creditors for the benefit of the corporation.
Gheewalla , 930 A.2d at 103. See also Sanford v. Waugh & Co., Inc. , 328 S.W.3d 836, 846 (Tenn. 2010) ("We agree with and adopt the Delaware Supreme Court's reasoning and holding in Gheewalla ."); Christians v. Grant Thornton, LLP , 733 N.W.2d 803, 809 (Minn. Ct. App. 2007) (stating that Minnesota law is not in conflict with Gheewalla 's holding and citing Delaware law as "more clearly developed" on the issue); Metcoff v. Lebovics , 51 Conn.Supp. 68, 977 A.2d 285, 290 (2007) ("[T]he reasoning of [ Gheewalla ] is persuasive and dispositive ...."); GoHealth, LLC v. Simpson , 2013 WL 6183024, at *5 (N.D. Ill., Eastern Div. 2013) ("the Illinois Supreme Court would likely adopt the holding and reasoning of Gheewalla ").
[¶140] Courts have been more reluctant to find that directors of insolvent LLCs owe fiduciary duties to the LLC's creditors, and decisions on the issue take different approaches. In CML V, LLC v. Bax , 6 A.3d 238 (Del. Ch. 2010), aff'd , 28 A.3d 1037 (Del. 2011), the court held that a creditor of an insolvent LLC lacked standing to sue derivatively under Delaware's limited liability company act. The creditor argued the same considerations that give creditors standing to pursue derivative claims against the directors of insolvent corporations entitle creditors to sue derivatively on behalf of an insolvent LLC. Id. at 241. The court analyzed Delaware's LLC Act, including 6 Del. C. § 18-1001, which creates a statutory right in "[a] member or an assignee" to bring a derivative action. Id. ; 6 Del. C. § 18-1001. Another section entitled "Proper Plaintiff" provides: "In a derivative action, the plaintiff must be a member or an assignee of a limited liability company interest at the time of bringing the action[.]" CML V, LLC , 6 A.3d at 241 ; 6 Del. C. § 18-1002. The court, finding that the plain language of section 18-1002 requires a plaintiff in a derivative suit to be a member or assignee, held that the LLC Act barred creditors of insolvent LLCs from suing derivatively. CML V, LLC , 6 A.3d at 241. The court acknowledged this holding created a sharp "distinction between insolvent corporations, where creditors can sue derivatively, and insolvent LLCs, where they cannot," id. at 249, but reasoned that "[i]n light of the expansive contractual and statutory remedies that creditors of an LLC possess, it does not create an absurd or unreasonable result to deny derivative standing to creditors of an insolvent LLC." Id. at 254. The court reasoned that "[b]ecause the conceptual underpinnings of the corporation law and Delaware's [alternative entity] law are different, courts should be wary of uncritically importing requirements from [corporate law] into the [alternative entity] context," id. at 249-50, and cited several provisions of the LLC Act that justified treating LLCs and corporations differently.
[¶141] First, the court cited the LLC Act's policy of giving "maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements" and noted that creditors can obtain "strong covenants, liens on assets, and other negotiated contractual protections." Id. at 250. It also cited a provision in the Act authorizing an LLC agreement to provide rights to people not parties to the LLC agreement. Id. This provision could allow creditors to bargain for express contractual rights in the LLC agreement while remaining a non-party, including for provisions triggered by insolvency that obligate directors to preserve assets for creditors. Id. at 250-51. The court noted that creditors can also protect themselves through "approval of any amendment to the LLC agreement on creditor consent or the satisfaction of conditions." Id. at 251. Additionally, the Act allowed a creditor to protect itself by seeking appointment of a receiver and provided a statutory right to enforce a member's obligation to make a contribution to the LLC. Id. at 252. In light of these "expansive contractual and statutory remedies," the court concluded that denying derivative standing to creditors of an insolvent LLC fulfilled "the statute's contractarian spirit." Id. at 254.
[¶142] Wyoming's Limited Liability Company Act shares some of these features. Section 17-29-902 creates a statutory right to bring a derivative action on behalf of an LLC. Section 17-29-903(a) states that such an action "may be maintained only by a person that is a member at the time the action is *804 commenced and remains a member while the action continues." Section 17-29-112(a) provides: "An operating agreement may specify that its amendment requires the approval of a person that is not a party to the operating agreement or the satisfaction of a condition. An amendment is ineffective if its adoption does not include the required approval or satisfy the specified condition."
[¶143] The Colorado Supreme Court declined to extend fiduciary duties to creditors of insolvent LLCs, regardless of standing, in Weinstein v. Colborne Foodbotics, LLC , 302 P.3d 263 (Colo. 2013). Colorado had previously recognized that fiduciary duties extend to creditors of insolvent corporations. Alexander , 152 P.3d at 502. However, Weinstein overruled a court of appeals decision that applied Alexander 's holding to the managers of an LLC. Weinstein , 302 P.3d at 269. The court observed that "[a]n LLC is distinct from a corporation" and, unlike the provisions of Colorado's LLC Act, which "permits the operating agreement to override the LLC Act's provisions in all but a few instances[,] ... the provisions of the Colorado Business Corporation Act control over a corporation's articles of incorporation." Id. at 266. The court noted that the only facet of corporation common law included in the LLC Act concerned veil-piercing. Id. (citing Colo. Rev. Stat. § 7-80-107(1) ). In contrast, the LLC Act contained no provision extending "the common law duty an insolvent corporation's directors owe to its creditors." Id. at 268. The LLC Act plainly stated that managers were not liable for the debts of the LLC and did not extend fiduciary duties to creditors. Id. at 269. Thus, the court held "absent statutory authority, the manager of an insolvent LLC does not owe the LLC's creditors the same fiduciary duty that an insolvent corporation's directors owe the corporation's creditors." Id.
[¶144] Similar reasoning applies here. We have recognized that Wyoming created new types of business entities, such as the LLC, in part to avoid the "many formal requirements as to [a corporation's] structure and governance," and that "[a] limited liability company's 'operation is intended to be much more flexible than a corporation's.' " GreenHunter , 2014 WY 144, ¶¶ 16-19, 337 P.3d at 460-61 (quoting Kaycee Land and Livestock , 2002 WY 73, ¶ 12, 46 P.3d at 328 ). In GreenHunter , we carried corporate common law over to LLCs with caution. Id. at ¶¶ 20-25, 337 P.3d at 461-62. Wyoming's LLC Act specifies that managers of a limited liability company owe duties of loyalty and care "to the company," and is silent as to any extension of fiduciary duties to creditors. See Wyo. Stat. Ann. § 17-29-409. Our emphasis on the differences between corporations and LLCs, our apparent caution to extend corporate common law to LLCs, and the lack of statutory language extending fiduciary duties to creditors, all constrain us from imposing fiduciary duties on an LLC to its creditors.
[¶145] Some courts have extended fiduciary duties to the creditors of insolvent LLCs. JPMorgan Chase Bank, N.A. v. KB Home , 632 F.Supp.2d 1013, 1027 (D. Nev. 2009) ("Because the justifications for the corporate insolvency exception are equally applicable to limited liability companies, the Court concludes the Nevada Supreme Court would extend the insolvency exception to limited liability companies."); In re McCook Metals, LLC , 319 B.R. 570, 595 (Bankr. N.D. Ill. 2005) ("These corporate law principles [extending fiduciary duties to the creditors of an insolvent corporation] are fully applicable to managers of insolvent limited liability companies.").[27] These cases are not persuasive. First, the sources cited above were all prior to the Delaware Chancery Court's decision in CML V, LLC , 6 A.3d 238. Like Gheewalla , *805 the decision will likely be persuasive to other courts considering the issue. See ¶ 140 supra ; Lyman Johnson, Unsettledness in Delaware Corporate Law: Business Judgment Rule, Corporate Purpose , 38 Del. J. Corp. L. 405, 406-07 & 406 n.2 (2013) (noting Delaware's "central role, historically, in expounding corporate law and, more recently, in fleshing out the law of noncorporate business entities" and asserting that "[b]oth the Delaware Supreme Court and the Delaware Chancery Court are issuing more and more important opinions in the noncorporate area"). Second, we have recognized the primacy of an LLC's operating agreement over the duties in Wyoming's LLC Act:
Wyoming's Limited Liability Company Act provides that the operating agreement governs "[t]he rights and duties under this chapter of a person in the capacity of manager," Wyo. Stat. Ann. § 17-29-110(a)(ii), and provides that "[t]o the extent the operating agreement does not otherwise provide for a matter ... this chapter governs the matter." Wyo. Stat. Ann. § 17-29-110(b). Thus, where the operating agreement contains specific provisions regarding a manager's rights and duties, it prevails . However, the Act also prohibits the operating agreement from eliminating the contractual obligation of good faith and fair dealing under Wyo. Stat. Ann. § 17-29-409(d).
Acorn , 2016 WY 124, ¶ 45, 386 P.3d at 753-54 (emphasis added); see also Sargent, supra §§ 1:3, 3:101 ("The statutes allow the owners of the business to use the operating agreement to set up the management of the entity pretty much as they please." ... "LLC statutes commonly give the parties a lot of flexibility in structuring their relationships. Courts typically have supported the contractual freedom of the parties."). North Star's Operating Agreement explicitly states that its managers owe their duties to the company. ("Each Manager shall perform the duties of Manager in good faith, in a manner he reasonably believes to be in the best interests of the Company [.]"; "A Manager shall not have any liability by reason of being or having been a Manager of the Company, except as a result of a breach of the Manager's duties to the Company .") (emphasis added). Finally, refusing to recognize a fiduciary relationship between an LLC's managers and its creditors adheres to precedent concerning the creation of fiduciary relationships:
We have said that fiduciary relationships are extraordinary and not easily created. Because fiduciary relationships carry significant legal consequences, they cannot be the product of wishful thinking. ... Our case law further indicates that we have been reluctant to impose additional duties and liability on lenders in a creditor/debtor relationship. We have said that the relationship between a lender and its customer is contractual in nature so we impose no duties higher than the morals of the marketplace. ... In our past case law, we have been rightfully hesitant to find tort causes of actions where a contract exists. ... Furthermore, ... [t]his relationship [between a creditor and a debtor] is inherently antagonistic.
Lee v. LPP Mortg. Ltd. , 2003 WY 92, ¶¶ 24-28, 74 P.3d 152, 162-63 (Wyo. 2003) (internal citations omitted). North Star's managers did not owe fiduciary duties to the LLC's creditors.
IX. The Garlands did not owe Mantles a duty of good faith
[¶146] The district court also granted summary judgment for defendants on Mantles' "bad faith" claim. First, Mantles argue Wyo. Stat. Ann. § 17-29-409 and North Star's Operating Agreement impose a duty of good faith on the Garlands. As discussed above, to the extent the Garlands had a duty to North Star, the proper remedy would be for a plaintiff with standing to sue derivatively on North Star's behalf. Mantles did not follow the required procedure for a derivative action.
[¶147] Mantles alternatively argue the Garlands owed a duty of good faith to Alex Mantle by virtue of his employment with North Star. We hold he failed to allege any facts supporting a cause of action for breach of the implied covenant of good faith and fair dealing. First, although we have recognized that an implied covenant of good *806 faith and fair dealing may arise in employment relationships, "it is only in rare and exceptional cases that the duty is of such a nature as to give rise to tort liability." Worley v. Wyoming Bottling Co., Inc. , 1 P.3d 615, 624 (Wyo. 2000) (quoting Wilder v. Cody Country Chamber of Commerce , 868 P.2d 211, 221 (Wyo. 1994) ). "A duty arises only where a special relationship of trust and reliance exists between the employer and the employee seeking recovery." Worley , 1 P.3d at 624. Although whether this special relationship exists is normally a question of fact, it may be decided on a motion for summary judgment if "reasonable minds could not differ." See id. A special relationship between an employer and an employee "may be found by the existence of separate consideration, common law, statutory rights, or rights accruing with longevity of service." Wilder , 868 P.2d at 221. Mantles offer no basis for this Court to find a disputed issue of material fact existed regarding the necessary special relationship between Alex Mantle and the Garlands, other than the fact he was "an employee who had personally guaranteed various [North Star] obligations." As the district court noted, "Defendants presented evidence that Alex Mantle incurred the debts he complains about ... voluntarily as part of his attempt to purchase North Star, and they did not arise out of his employment with North Star." Mantles failed to rebut the Garlands' evidence that no special relationship existed.
[¶148] Mantles' argument that principal obligors of a debt owe a duty of good faith to the guarantor of the debt in the form of full and fair disclosure is equally unavailing for the simple reason that, as President and CEO of North Star, Mr. Mantle had full access to all material facts. Finally, we find that any theory of liability contained in their single-sentence reference to corporate opportunity doctrine is not supported by cogent argument or citation to pertinent authority, and we therefore will not address it. See Whitham , 2018 WY 43, ¶ 25, 415 P.3d at 1270. We affirm the district court's grant of summary judgment on Mantles' bad faith claim.
X. The only breach of fiduciary duty claim the Garlands had should have been brought as a derivative claim
[¶149] The district court concluded that Mr. Mantle "had fundamental duties of loyalty and care to North Star," but that failing to renew the directors' and officers' insurance did not breach any fiduciary duties because there was no requirement that he do so. As to the Garlands' claims that Mr. Mantle breached his fiduciary duties by "1) failing to provide the members with accurate financial information; [and] 2) making loans beyond his borrowing authority," the court concluded that Mr. Mantle had indeed withheld information and exceeded his borrowing authority, but that the Garlands failed to establish any additional damages. Because the court ruled on these claims following a bench trial, we review the court's conclusions of law de novo and defer to its factual findings unless clearly erroneous. Ekberg , 2003 WY 123, ¶ 10, 76 P.3d at 1253.
[¶150] The Garlands assert that Mr. Mantle breached fiduciary duties he owed to North Star as its President, and to them, by virtue of an "informal fiduciary relationship." Mantles argue that Mr. Mantle had no fiduciary duty to provide financial information to the Garlands or FNB under Wyoming law. They argue the district court's ruling ignores the business judgment rule. Finally, they contend this counterclaim could only have been brought by North Star as a derivative action.
A. The claim for Alex Mantle's breach of his fiduciary duty to North Star was a derivative claim
[¶151] The Garlands assert that Mr. Mantle breached his fiduciary duties by failing to make full and fair disclosure of North Star's financial condition to them or FNB, and that "[a]s a direct result of" Mr. Mantle's misrepresentations concerning North Star's financial condition, "North Star incurred an additional $3 million debt that it could not service."
[¶152] "[W]hen [a] director (or shareholder or member) seeks to remedy an injury to the corporation rather than himself, *807 the action is derivative in nature."[28] Sullivan , 2018 WY 19, ¶ 22, 412 P.3d at 312. "As a general rule, recovery in such actions inures to the corporation rather than to the stockholders as individuals." Wallop Canyon Ranch, LLC v. Goodwyn , 2015 WY 81, ¶ 28, 351 P.3d 943, 951 (Wyo. 2015) (quoting Lynch v. Patterson , 701 P.2d 1126, 1130 (Wyo. 1985) ). Generally, "[a] claim is derivative in nature where the plaintiff was not injured 'directly or independently' of the [entity]." Wallop , 2015 WY 81, ¶ 29, 351 P.3d at 951. To the extent the Garlands assert Mr. Mantle breached a fiduciary duty to North Star, we agree the action could only have been brought as a derivative action.
[¶153] Wyoming's Limited Liability Company Act specifies that any duties arising from fiduciary relationships are owed exclusively to the company, unless otherwise agreed. Wyo. Stat. Ann. § 17-29-409 ; Wyo. Stat. Ann. § 17-29-110. North Star and its members and managers did not otherwise agree.
[¶154] To proceed with a derivative action, a plaintiff must meet certain statutory requirements. GOB, LLC v. Rainbow Canyon, Inc. , 2008 WY 157, ¶ 13, 197 P.3d 1269, 1272 (Wyo. 2008). When a derivative action is brought on behalf of an LLC, the plaintiff must: (1) be a member of the LLC; and (2) make demand on the other members of the LLC or state with particularity why demand would be futile. Wyo. Stat. Ann. §§ 17-29-902 to 904. The distinction between a derivative action and a direct action is important because "a plaintiff who mischaracterizes a derivative cause of action as direct [risks] dismissal of the claim" for failure to comply with derivative suit procedural requirements. Daniel S. Kleinberger, Direct Versus Derivative and the Law of Limited Liability Companies , 58 Baylor L. Rev. 63, 71 (2006). The Garlands did not comply with the requirements to bring a derivative action, and the district court properly dismissed their breach of fiduciary claims against Mr. Mantle.
B. Although the Garlands may have claims against Mr. Mantle that are not derivative, as to such claims, they have not established that he owed them a fiduciary duty
[¶155] The Garlands contend Mr. Mantle owed them fiduciary duties "by virtue of the MOU," which created an "informal fiduciary relationship" between them. They cite Martinez , 891 P.2d at 789, for the proposition that "Wyoming recognizes an informal fiduciary relationship" implied in law. However, they overlook the holding in Martinez . The Court there declined to hold the facts supported a finding that a fiduciary relationship was implied, and it held "[s]uch a relationship is extraordinary and not easily created." Id. at 789 ; see also Lee , 2003 WY 92, ¶ 24, 74 P.3d at 162. Further, "one asserting a fiduciary relationship bears the burden of establishing it by clear and convincing evidence, and we will not over reach ourselves to posit such a profound circumstance." Martinez , 891 P.2d at 789. The Garlands have not established that such clear and convincing evidence of a fiduciary relationship between Mr. Mantle and them exists, independent of his fiduciary relationship to North Star.
[¶156] We reject the notion that a fiduciary relationship arises out of the MOU. A contractual relationship "impose[s] no duties higher than the morals of the marketplace," and "we have been rightfully hesitant to find tort causes of actions where a contract exists. [ Hulse v. First Am. Title Co. , 2001 WY 95, ¶ 45, 33 P.3d 122, 136 (Wyo. 2001) ] (when parties' difficulties arise directly from a contractual relationship, the resulting litigation concerning those difficulties is one in contract)." Lee , 2003 WY 92, ¶ 27, 74 P.3d at 162. Finally, we affirm the district court's conclusion *808 that Mr. Mantle had no duty to renew the insurance policy.
[¶157] Mr. Mantle's fiduciary duty was to North Star, and not to the Garlands individually. Therefore claims of breach of fiduciary duty could only have been brought as derivative claims. Because they were not, the Garlands' claim against Mr. Mantle for breach of fiduciary duty fails.
XI. The district court did not abuse its discretion when it denied Mantles' attorney fees
[¶158] The district court in its Order After Bench Trial awarded Mantles attorney fees, which were provided for in the FNB loan documents. The court cautioned "they are only entitled to attorney's fees related to [the subrogation] count" and it advised them to "be mindful of Stafford v. JHL, Inc. , [2008 WY 128,] 194 P.3d 315 (Wyo. 2008), which requires them to sufficiently itemize their affidavit for attorney's fees so that the Court may distinguish" the appropriate amount of fees. The affidavit the Mantles submitted did not itemize their fees to relate them to the subrogation count. Instead, they argued that "the claims herein for fraudulent conveyances and alter ego allegations were pursued for the purposes of Plaintiffs' recovering the $2,712,838.22 this Court eventually awarded them." The district court found that Mantles had failed to sufficiently itemize their attorney fees and denied their claim.
We review the denial of an award for attorney fees for an abuse of discretion.
A court abuses its discretion only when it acts in a manner which exceeds the bounds of reason under the circumstances. The burden is placed upon the party who is attacking the trial court's ruling to establish an abuse of discretion, and the ultimate issue is whether the court could reasonably conclude as it did.
Stafford , 2008 WY 128, ¶ 14, 194 P.3d at 318 (citations omitted).
[¶159] Mantles argue the district court abused its discretion when it denied the fee award, because "this entire litigation was so interwoven between Mantles' claims and the Counterclaim (particularly the equitable estoppel claim) that it would have been an arbitrary effort to try to distinguish the time and expense" attributable to Mantles' subrogation claim. Mantles, however, ignore the fact that the district court granted them summary judgment on their subrogation claim, and the only matter for trial was the "amount of damages." The district court did not abuse its discretion when it concluded the Mantles failed to distinguish the amount of attorney fees attributable to the subrogation count.
CONCLUSION
[¶160] The Garlands and their associated entities did not abandon their counterclaims when they did not refile them after the amended complaint; the MOU is an enforceable contract; the district court did not err in finding that Mr. Mantle's negligent misrepresentation entitled the Garlands to no additional damages; the district court correctly dismissed the Mantles' fraud claim; the district court correctly concluded that some conveyances by the Garlands fit the definitions of a fraudulent conveyance under the Wyoming Uniform Fraudulent Transfer Act; the Garlands were not entitled to equitable affirmative defenses as to those conveyances; the elements for LLC veil-piercing were absent; the LLC's members did not have a fiduciary duty to its creditors; the Garlands did not owe Mr. Mantle a duty of good faith; any breach of fiduciary duty claim the Garlands had against Mr. Mantle should have been brought as a derivative action; and the district court did not abuse its discretion when it denied Mantles' attorney fees. We affirm the district court's Order on Summary Judgment Motions and Order After Bench Trial in all respects.

For clarity, we will refer to Ray, Gary, and Matt by their first names when referring to them individually, and as "the Garlands" when referring to them collectively.

The record cites provided by Gary Garland and Hot Iron, Inc. are of little assistance to the Court. They used a numbering system that had no relation to the record. Further, it appears that almost all their cites are to their summary judgment and exhibits thereto, even though most of the issues appealed are from the district court's decision following the bench trial.

Root v. Root , 2003 WY 36, ¶ 7, 65 P.3d 41, 44 (Wyo. 2003) ("blue sky" is the intangible, or "good will," value of a business).

In a September 4, 2014 email to the Garland brothers, Mr. Mantle explained: "Your payroll will not be changed right now but sooner rather than later the dollars you receive will be called interest expense rather than payroll."

This meeting was dubbed the "white board meeting" because Gary Garland kept a photo of Mr. Killmer's white board calculations.

The record does not reveal any new ANB loan terms at that time. Ann Nelson, the ANB banker, testified that she had been informed of the FNB $3-million loan, but it "was presented as a loan to Alex Mantle" or perhaps to Mr. Mantle and Mr. Killmer, not as a loan to North Star. A loan to North Star would trigger the loan covenant that provided no additional debt would be incurred without prior approval by ANB.

Gary testified that GTI also gave North Star seven months of rent credits, bringing the purchase price to $800,000.

Sale of the Gillette property to pay down the ANB debt had been proposed by Mr. Killmer in his November 22nd email ("if all we do is pay down debt ($600,000 ish) then we will save interest cost ....").

During negotiations with FNB in May 2015, the Mantles' attorney objected to certain provisions in the new commercial loan agreement, saying "NS and Garlands are likely to file a countersuit against Alex alleging breach of contract regarding a stock purchase agreement."

W.R.C.P. 15(a) now reads: "Unless the court orders otherwise, any required response to an amended pleading must be made within the time remaining to respond to the original pleading or within 14 days after service of the amended pleading, whichever is later." W.R.C.P. 15(a)(3) (LexisNexis 2018).

Mantles argue Idaho Migrant Council, Inc. v. Warila , 890 P.2d 39, 40 (Wyo. 1995), supports the proposition that "the standard of review of this issue is de novo ." However, Warila involved review of an allegedly ambiguous agreement following a bench trial, and we applied a mixed clearly erroneous/de novo standard of review. Id.

It is difficult to credit a "misassumption" on Mr. Mantle's part, considering he signed the ANB loan documents on behalf of North Star, and he misrepresented the status of the FNB loan to ANB.

The parties have not raised, and we will not address, the question whether the tort action can be maintained when the "parties' difficulties arise directly from a contractual relationship." Snyder v. Lovercheck , 992 P.2d 1079, 1088 (Wyo. 1999). Further, Gary argues for the first time in his reply brief, on appeal, that he did suffer additional damages due to the subordination agreement. We do not address matters raised for the first time on appeal.

Paragraph 64 of the proposed amendment does refer to the Garlands' written representations and the Mantles' justifiable reliance on them, but it does not identify particular representations, how the Mantles relied on them, or why that reliance was reasonable or justified. Thus, the claim would have remained subject to dismissal under W.R.C.P. 9(b), rendering amendment futile.

When determining whether someone is a present or future creditor, the relevant inquiry is when the claim arose, not when the creditor seeking to collect acquired the right to payment. In other words, "[t]he right to attack a conveyance as being in fraud of creditors is not personal to the original creditor, but may be exercised by the creditor's successors or assignees." 37 C.J.S. Fraudulent Conveyances § 49, Westlaw (database updated February 2019). FNB became North Star's creditor in September 2014. The challenged transfers all occurred after September 2014. Thus, FNB qualified as a present creditor. 37 C.J.S. Fraudulent Conveyances § 45, Westlaw (database updated February 2019) ("Preexisting creditors are persons having subsisting claims against the debtor at the time the fraudulent conveyance was made[.]"). When FNB sold its note to the Mantles, they acquired FNB's rights as present creditors; thus, Ray Garland's argument that the Mantles do not qualify as present creditors is unavailing.

Opinions under the Bankruptcy Code are persuasive authority when interpreting the UFTA. Sullivan, supra at 960. Likewise, because one of the UFTA's purposes is to "make uniform the law with respect to [fraudulent transfers] among states," Wyo. Stat. Ann. § 34-14-212, the interpretation of other courts that have adopted the UFTA provide guidance to this Court. See In re Reed's Estate , 566 P.2d 587, 589 (Wyo. 1977) (finding a California case "particularly applicable," in part, because both Wyoming and California had adopted the UFCA). The Uniform Fraudulent Conveyances Act (UFCA) was the precursor to the UFTA. Elaine A. Welle, Is It Time for Wyoming to Update Its Fraudulent Conveyance Laws? , 5 Wyo. L. Rev. 207, 213-14 (2005). Although different from the UFTA in some important respects, there is overlap between the two Acts, and they share a common purpose. Sullivan, supra at 960. "Consequently, cases that are interpreting one statute are often relied upon when interpreting another." Id. Thus, cases interpreting the Code, the UFTA, and the UFCA, from this jurisdiction and others, are cited throughout this opinion.

As noted, the Mantles qualify as present creditors; thus, both Wyo. Stat. Ann. §§ 34-14-205(a)(ii) and 34-14-206(a) apply to them. Given that the only remaining difference between Wyo. Stat. Ann. §§ 34-14-205(a)(ii) and 34-14-206(a) is the phrasing concerning the financial condition of the debtor, and that this difference does not affect these circumstances, we consider these sections together.

Although demonstrative exhibits are not normally part of the record, here, all parties heavily relied on Exhibit B, and the district court made it part of the record.

Ray alternatively argues the transfers to him were not fraudulent because North Star was a mere bailee of funds that rightfully belonged to him. Ray did not raise this argument below. We will not address it. Stevens v. Anesthesiology Consultants of Cheyenne, LLC , 2018 WY 45, ¶ 39, 415 P.3d 1270, 1284 (Wyo. 2018) ("We do not address issues that were not raised below, unless it involves fundamental constitutional questions or the trial court's subject matter jurisdiction.").

The Garlands initially argued on appeal that they were entitled to set off the amount awarded to the Mantles against the amount of the award against Mr. Mantle arising from his breach of the MOU. However, Ray's motion to dismiss his appeal of the setoff issue was granted prior to oral argument, and Gary stated in his reply brief that claim was moot because the setoff had by then been granted by the district court in its post-trial Order on Pending Motions. We therefore do not address the setoff issue in this appeal.

Other than the brief assertion that "WyoDak never attempted to explain, much less justify, Gary Garland's involvement in these title issues," Mantles do not explain how WyoDak would qualify as an "insider." Thus, we will not consider Wyo. Stat. Ann. § 34-14-206(b).

Despite dismissing the claim and WyoDak from the action on summary judgment, the court readdressed the transfer of the 16 pickup trucks in its Order After Bench Trial because "Plaintiffs still put on a great deal of evidence relating to this transaction." However, WyoDak was dismissed from the case after summary judgment, so we consider that to be the final appealable order as to WyoDak.

The Mantles did not appeal the district court's conclusion on their alter-ego claims against the Garlands individually.

The Wyoming legislature amended Wyo. Stat. Ann. § 17-29-304, codifying the factors courts may consider when determining whether to hold members and managers of LLCs liable for the debts of the LLC. 2016 Wyo. Sess. Laws ch. 54. That amendment does not apply to this matter. Wyo. Stat. Ann. § 8-1-107 ("If a statute is repealed or amended, the repeal or amendment does not affect pending actions, prosecutions or proceedings, civil or criminal.").

At least one court has held that, because avoidance of fraudulent conveyances provided a sufficient remedy to any inequitable conduct, piercing the veil was not necessary. Morgan v. Burks , 93 Wash.2d 580, 611 P.2d 751, 756-57 (1980) (en banc).

"When 'two or more corporations [are] controlled by the same, or substantially the same, owners,' the corporations are called 'sisters.' " Minno , 905 N.E.2d at 617 (quoting Black's Law Dictionary 368 (8th ed. 2004) ) (alteration in original).

Additionally, several commentators have assumed fiduciary duties would extend to creditors of insolvent LLCs and, in light of that assumption, debate whether an LLC operating agreement can limit the fiduciary duties a creditor can invoke. See, e.g. , Royce de R. Barondes et al., Twilight in the Zone of Insolvency: Fiduciary Duty and Creditors of Troubled Companies , 1 J. Bus. & Tech. L. 229, 249 (2007) (panel discussion); Andrew S. Gold, On the Elimination of Fiduciary Duties: A Theory of Good Faith for Unincorporated Firms , 41 Wake Forest L. Rev. 123, 176-77 (Spring 2006) ; Mark M. Maloney & Michelle L. Carter, Asserting Breach-of-Fiduciary-Duty Claims in the Context of Delaware LLCs , 28-SEP Am. Bankr. Inst. J. 36 (Sept. 2009) ; Myron M. Shienfeld & Judy Harris Pippitt, Fiduciary Duties of Directors of a Corporation in the Vicinity of Insolvency and After Initiation of a Bankruptcy Case , 60 Bus. Law. 79, 87 (Nov. 2004).

Courts can apply corporate precedent to derivative suits on behalf of other types of business entities. 1 Ribstein & Keatinge on Ltd. Liab. Cos. § 10:3, n.6 (citing Safety Tech., L.C. v. Biotronix 2000, Inc. , 136 F.Supp.2d 1169 (D. Kan. 2001) (applying corporate precedent in distinguishing derivative and individual actions and stating that the "derivative suit is a corporate concept grafted onto the limited liability company form") (quoting Elf Atochem N. Am. v. Jaffari , 727 A.2d 286, 293 (Del. 1999) ) ); Wallop , 2015 WY 81, ¶ 29, 351 P.3d at 952 ("In ascertaining whether a cause of action arising in a limited partnership context is derivative, it is appropriate to look to corporate law for guidance.") (quoting 59A Am. Jur. 2d Partnership § 906, at 821 (2003) ).